

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-6-1999

# Halper v. Halper

Precedential or Non-Precedential:

Docket 98-5093

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Halper v. Halper" (1999). *1999 Decisions.* Paper 2.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/2

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed January 6, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-5093

IRWIN HALPER,

  Appellant

v.

BARRY HALPER

On Appeal From the United States District Court
For the District of New Jersey
(D.C. Civil Action No. 97-cv-02616)
District Judge: Honorable Garrett E. Brown, Jr.

Argued October 26, 1998

BEFORE: STAPLETON, LEWIS and MAGILL,*

Circuit Judges

(Opinion Filed January 6, 1999)

Colin M. Danzis
Dennis J. Drasco (Argued)
Donald B. Frazer, Jr.
Lum, Danzis, Drasco, Positan &
Kleinberg, LLC
103 Eisenhower Parkway
Roseland, NJ 07068-1049

  Attorneys for Appellant
_____

*Honorable Frank J. Magill, Senior United States Circuit Judge for the
Eighth Circuit, sitting by designation.

William S. Katchen (Argued)
Tina Niehold Moss
Amy R. Bitterman
Lowenstein Sandler PC
65 Livingston Avenue
Roseland, NJ 07068

   Attorneys for Appellee

OPINION OF THE COURT

STAPLETON, Circuit Judge:

Irwin Halper appeals the District Court's order affirming the Bankruptcy Court's order determining that a Guaranty in favor of Irwin was void as against public policy because it was part of an illegal stock redemption and a fraudulent conveyance under New Jersey and federal bankruptcy law. We conclude that the District Court erroneously applied New Jersey's contract principles in the course offinding this to be a stock redemption. We further conclude that the Bankruptcy Court lacked core proceeding jurisdiction to enter a final judgment regarding the Guaranty's enforceability.

I. FACTUAL AND PROCEDURAL BACKGROUND

Irwin Halper and his three cousins, Barry, Jeffrey and Robert, were the sole owners of Halper Bros. Inc. ("HBI"), a New Jersey corporation that distributed wholesale paper and janitorial supplies. Each cousin owned 25% of HBI's stock and participated in HBI's management and operation. In the spring of 1990, each shareholder contributed $300,000 to HBI's Employee Stock Ownership Plan ("ESOP"). In 1989 and into 1990, HBI began to suffer financial difficulty. Barry, interested in restructuring to continue running HBI on his own, began negotiating a buyout of his cousins' stock. On February 13, 1991, the cousins entered an agreement ("February Agreement") whereby Barry agreed to purchase personally each of his cousins' 25% HBI stock holdings for $300,000 apiece with $25,000 down. Barry paid Irwin's $25,000 down payment

2

by personal check. The February Agreement was not consummated, however, because Citibank, a creditor of HBI's, refused to approve the buyout.

Further buyout negotiations ensued in which Barry suggested that the transaction be structured as a stock redemption by HBI. The three selling cousins, however, rejected the redemption format because they were concerned that HBI's insolvency would render it an illegal redemption and a fraudulent transfer under New Jersey law. Instead, Irwin and the other selling cousins insisted that the buyout take place either (i) through a personal purchase by Barry, or (ii) by an entity formed by Barry.[1] Barry's accountants and lawyers, on the other hand, advised Barry that if the transaction included an employment agreement for each of the cousins giving up his stock, the compensation provided for his services would provide HBI with a significant tax deduction. This raised further concerns for the selling cousins who feared that HBI's financial condition might prevent it from honoring an employment arrangement.

The parties reached a compromise, which they memorialized in four agreements on September 5, 1991 ("September Transaction"): (i) Letter Agreement, (ii) Employment Agreement, (iii) Guaranty and Indemnity Agreement, and (iv) Voting Trust Agreement. (Pa. 527-89). There were three parties to each set of documents: (i) the selling cousin involved, (ii) Barry Halper, and (iii) HBI represented by Barry Halper as President. This appeal involves only the rights of the parties to the agreements executed by Irwin Halper.

_____

1. An August 2, 1991 letter from the law firm representing Irwin, Robert and Jeffrey illustrates their position:

    The possibility of insolvency involved litigation as to the redemption
    of our client's stock by [HBI] strongly argues in favor of a direct
    purchase by Barry or an entity created and funded by him for such
    purpose. . . . [A]ll [HBI] stock owned by [Irwin, Jeffrey and Robert]
    must be purchased and all of the purchase price paid either by
    Barry Halper or an entity controlled by him, and not[HBI].

(Pa. 524).

3

The Agreements are integrated. This is evident from (i) the Letter Agreement's summary of the transaction and description of the other three documents' significance, and (ii) the other three documents' numerous cross references to one another. The Employment Agreement provides, inter alia, that HBI would pay Irwin a $300,000 signing bonus less the $25,000 he received in connection with the failed February Agreement, with the remaining $275,000 to be paid in 12 equal monthly installments commencing January 31, 1992.[2] The Guaranty and Indemnity Agreement ("Guaranty") provided that Barry personally guaranteed HBI's payment of Irwin's signing bonus; Barry and Irwin signed it in their individual capacities. The Guaranty accommodated the selling cousins' concerns that HBI's financial troubles might prevent it from honoring its signing bonus obligation. The Voting Trust Agreement provided that Irwin's HBI shares would be immediately transferred to a voting trust with Barry as trustee, giving Barry the irrevocable right to vote Irwin's shares. Finally, Paragraph 9 of the Letter Agreement provided that Irwin granted a three year irrevocable option to purchase his HBI stock for $1.00 consideration to (i) Barry personally, (ii) an entity created by Barry for the purchase, or (iii) HBI.

The parties agree that the September Transaction's objective was to vest Barry with total ownership and control of HBI. Indeed, the September Transaction gave Barry absolute control over HBI on September 5, 1991, as trustee under the Voting Trust. The only thing left to complete the buyout was for Barry to decide how to exercise the option to transfer beneficial ownership of the shares.

That decision was made in January, 1992, when Barry's attorney, Mr. Gladstone, advised him that he should exercise the Paragraph 9 option. On January 15, 1992, Gladstone's firm drafted a letter which Barry signed ("Purchase Letter") stating:

> Pursuant to paragraph 9 of the Letter Agreement you
> are hereby notified that I elect to exercise my option to
> acquire all of the shares of stock in [HBI] which are

---

2. The Employment Agreement also provided that Irwin would continue as a HBI salesman and granted him a car, insurance and other benefits.

4

> held by the Voting Trustee pursuant to the Voting
> Trust Agreement.
>
>  I hereby request that the Voting Trustee take
> immediate steps in order to effectuate the transfer of
> said shares of stock to me.

(Pa. 526). Barry signed the letter in his personal capacity, not as HBI's President.

On January 17, 1992, two days after Barry exercised the option, HBI's creditors filed an involuntary bankruptcy petition. Not surprisingly, HBI did not honor its signing bonus obligations under the Employment Agreement, and Irwin resorted to his rights under the Guaranty. After several unsuccessful demands for payment from Barry, Irwin instituted an action in New Jersey Superior Court to enforce the Guaranty on January 24, 1993. Two days earlier, on January 22, 1993, Barry had filed a complaint in Bankruptcy Court. Barry's complaint provides in pertinent part:

> Barry seeks a declaration from this Court (1) that the
> underlying obligation from HBI to Irwin is void as a
> redemption by a corporation while insolvent, and a
> further declaration that Barry's personal guaranty does
> not extend to this void agreement and (2) that the
> obligation arising out of the "signing bonus" is void as
> a fraudulent transfer.
>
> *   *   *
>
> WHEREFORE, plaintiff Barry Halper demands
> judgment against Irwin Halper as follows:
>
>  (a) declaring that the signing bonus to be paid by
> [HBI] to Irwin Halper is void as (1) a redemption made
> by an insolvent corporation; and (2) that the obligation
> is a fraudulent transfer under Bankruptcy Code
> S 548(a)(2)
>
>  (b) declaring that Barry Halper's obligation to Irwin
> Halper does not include the void redemption or
> fraudulent transfer by [HBI] . . . .

(Pa. 1243-44). Alternatively, Barry sought a declaratory judgment that (i) if the signing bonus is a valid obligation

5

of HBI, then HBI's obligation thereunder is limited to $75,000 under Bankruptcy Code S 502(b)(7); and (ii) that Barry's liability under the Guaranty should similarly be limited to $75,000.[3]

Barry successfully removed Irwin's state court action to the Bankruptcy Court, and the actions were consolidated for trial over Irwin's objection that the Bankruptcy Court lacked jurisdiction over his suit. Four years later, on February 21, 1997, the Bankruptcy Court rendered judgment in favor of Barry declaring the Guaranty unenforceable as against New Jersey's public policy because it was part of an illegal stock redemption under New Jersey law and constituted a fraudulent transfer under New Jersey and federal bankruptcy law. Irwin appealed the Bankruptcy Court's order to the District Court, which affirmed.[4] Irwin now appeals the District Court's order affirming the Bankruptcy Court's judgment.

We exercise plenary review over the decision of a District Court sitting as an appellate court in a bankruptcy proceeding. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 559 (3d Cir. 1994). In turn, this court reviews the Bankruptcy Court's findings of fact under the clearly erroneous standard and conclusions of law under a de novo standard. See In re Sharon Steel Corp., 871 F.2d 1217, 1222–23 (3d Cir. 1989).

_____

3. Bankruptcy Code S 502(b)(7) limits employee claims for damages arising from the debtor's termination of an employment contract.

4. The Bankruptcy Court's judgment order grants Barry's request for declaratory judgment stating:

> 1) The transaction memorialized in the series of agreements entered into by and between the parties on September 5, 1991 constitutes an (i) illegal stock redemption by the Debtor while insolvent and (ii) a fraudulent conveyance pursuant to 11 U.S.C. S 548 and N.J.S.A. 25:2–20, et seq.; and
>
> 2) The Guaranty is void and unenforceable; and
>
> 3) Judgment is hereby entered in favor of Barry Halper, and against Irwin Halper, in the above captioned matters.

(Pa. 35). The District Court's order simply states that it affirms. (Pa. 21).

6

## II. JURISDICTION

The Bankruptcy and District Courts determined that the Bankruptcy Court had core proceeding jurisdiction under 28 U.S.C. S 157(b) giving it the power to issue final judgment on all claims in this action. Irwin challenges this determination, claiming that the Bankruptcy Court entirely lacked jurisdiction to entertain the claims between Barry and himself. He objects on the grounds that HBI was not a party and that, in his view, the adjudication of their disputes could not affect HBI's creditors. He concludes that this entire proceeding is therefore not "related to" the bankruptcy as required to support non-core jurisdiction under 28 U.S.C. S 157(c).

We conclude that the Bankruptcy Court had jurisdiction over all claims asserted in the Bankruptcy Court, but that the character of its jurisdiction varied among the claims. We find that the Bankruptcy Court had only non-core jurisdiction over the Guaranty claims and that, as a result, it lacked the power to issue a final judgment on that matter. Accordingly, we will reverse the District Court's judgment affirming the exercise of core jurisdiction over the Guaranty claims.

Bankruptcy Court jurisdiction has been the subject of heated controversy in recent decades. See In re Guild & Gallery Plus, Inc., 72 F.3d 1171, 1176-79 (3d Cir. 1996)(discussing Bankruptcy Courts' history); Phar-Mor, Inc. v. Coopers & Lybrand, 22 F.3d 1228, 1234-35 (3d Cir. 1994)(same). In 1978, Congress attempted to centralize bankruptcy jurisdiction by granting District and Bankruptcy Courts expanded jurisdiction over cases arising under title 11. In re Guild, 72 F.3d at 1177 (quoting Thomas S. Marion, Core Proceedings and "New" Bankruptcy Jurisdiction, 35 DePaul L. Rev. 675, 678 (1986)). Under this scheme, Article I bankruptcy judges possessed full power to adjudicate not only cases arising directly under title 11, but also a wide range of other claims merely "related to" the title 11 proceedings. Id. In Northern Pipeline Const. Co. v. Marathon Pipeline Co., 458 U.S. 50 (1982), however, the Supreme Court held the 1978 jurisdictional reform unconstitutional because its grant of judicial power to Article I Bankruptcy Courts violated the separation of

7

powers doctrine by undermining Article III's establishment of an independent judiciary. Id. at 84-85.

In Marathon, the debtor had filed a chapter 11 petition in Bankruptcy Court and subsequently initiated an adversary proceeding against Marathon for various pre-petition violations of state law including breach of contract. The parties to the adversary proceeding were not diverse, and the dispute involved pure questions of state law presenting no federal question. The only basis for federal jurisdiction was the fact that one party was a chapter 11 debtor in bankruptcy. Id. at 90. Distinguishing "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power . . . from the adjudication of state-created private rights, such as the right to recover damages that is at issue in this case," Justice Brennan concluded that the statute violated Article III because it unconstitutionally vested "all `essential attributes' of the judicial power of the United States in the `adjunct' [Article I] bankruptcy courts." Id. at 71, 84-85 (emphasis added).

In 1984, Congress responded to Marathon and established the current bankruptcy jurisdiction regime codified at 28 U.S.C. S 1334 and 28 U.S.C. S 157. Section 1334 vests broad primary jurisdiction over bankruptcy proceedings in the District Courts.5 District Courts may, however, refer bankruptcy matters falling within their jurisdiction to the Bankruptcy Courts under 28 U.S.C. S 157(a). District Courts have exercised this power by "routinely refer[ing] most bankruptcy cases to the bankruptcy court[s]." In re Guild, 72 F.3d at 1175.

Upon referral, "[s]ection 157 provides the bankruptcy

_____

5. Section 1334 of title 28 states in pertinent part:

      (a) Except as provided in subsection (b) of this section, the district
      court shall have original and exclusive jurisdiction of all cases under
      title 11.

      (b) Notwithstanding any Act of Congress that confers exclusive
      jurisdiction on a court or courts other than the district courts, the
      district courts shall have original but not exclusive jurisdiction of all
      civil proceedings arising under title 11, or arising in or related to
      cases under title 11.

court with two levels of judicial power, depending upon the type of proceeding before it." In re Marcus Hook, 943 F.2d 261, 266 (3d Cir. 1991). First, in "core" proceedings, the Bankruptcy Court assumes the role of a court of first instance with comprehensive power to hear, decide and enter final orders and judgments. See 28 U.S.C. S 157(b)(1). Appellate review of the Bankruptcy Court's judgment is available initially in the District Court and then in the Court of Appeals. See 28 U.S.C. S 158. Second, in "non-core" proceedings, the Bankruptcy Court's adjudicatory power is limited to hearing the dispute and submitting "proposed findings of facts and conclusions of law to the district court." Id. S 157(c)(1). 6 The District Court, after considering the Bankruptcy Court's proposed findings and conducting a de novo review of any matter objected to therein, enters final orders and judgments in "non-core" proceedings. See id. at S 157(c)(1). Section 157's distinction between "core" and "non-core" proceedings mirrors Justice Brennan's distinction in Marathon, and the jurisdictional variance between the two types of proceedings was intended "to satisfy the concerns of Marathon." Phar-Mor, 22 F.3d at 1234; see In re Wood, 825 F.2d 90, 96 (5th Cir. 1987)(discussing congruence between Marathon and S 157's jurisdictional regime).

Thus, a proceeding's core or non-core nature is crucial in bankruptcy cases because it defines both the extent of the Bankruptcy Court's jurisdiction, and the standard by which the District Court reviews its factual findings. To determine whether a proceeding is a "core" proceeding, courts of this Circuit must consult two sources. First, a court must consult S 157(b). Although S 157(b) does not precisely define "core" proceedings, it nonetheless provides an illustrative list of proceedings that may be considered "core." See id. S 157(b)(2)(A)-(O). Second, the court must apply this court's test for a "core" proceeding. Under that test, " `a proceeding is core [1] if it invokes a substantive right provided by title 11 or [2] if it is a proceeding, that by its nature, could arise

_____

6. The District Court may, upon consent of the parties, expand the Bankruptcy Court's power to adjudicate "non-core" proceedings to include the power to issue final orders and judgments. 28 U.S.C. S 157(c)(2).

only in the context of a bankruptcy case.' " In re Guild & Gallery Plus, Inc., 72 F.3d 1171, 1178 (3d Cir. 1996)(quoting Marcus Hook, 943 F.2d at 267); see In re: Continental Airlines, 125 F.3d 120, 131 (3d Cir. 1997); cf. Beard v. Braunstein, 914 F.2d 434, 444 (3d Cir. 1990). This Court and other courts of appeals have relied on this test to ensure that S 157(b) "core" proceeding jurisdiction is exercised in a manner consistent with Marathon.7

Non-core proceedings include the broader universe of all proceedings that are not core proceedings but are nevertheless "related to" a bankruptcy case. See 28 U.S.C. S 157(c)(1). "[T]he test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." Pacor v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984) (emphasis omitted); see In re Guild, 72 F.3d at 1180-81.8 "[T]he proceeding need not

_____

7. See, e.g., Sanders Confectionary Prod's v. Heller Fin., 973 F.2d 474, 483 (6th Cir. 1992)("A core proceeding either invokes a substantive right created by federal bankruptcy law or [is] one which could not exist outside of the bankruptcy."); In re United States Brass Corp., 110 F.3d 1261, 1268 (7th Cir. 1997)("Core proceedings are actions by or against the debtor that arise under the Bankruptcy Code in the strong sense that the Code itself is the source of the claimant's right or remedy . . . ");
Specialty Mills, Inc. v. Citizens State Bank, 51 F.3d 770, 773 (8th Cir. 1995)("Core proceedings under 28 U.S.C. S 157 are those which arise only in bankruptcy or involve a right created by federal bankruptcy law."); Security Farms v. International Brh'd of Teamsters, Chauffeurs, Wharehouseman & Helpers, 124 F.3d 999, 1008 (9th Cir. 1997) ("Actions that do not depend on bankruptcy laws for their existence and that could proceed in another court are considered `non-core.' "); In re Gardner, 913 F.2d 1515, 1518 (10th Cir. 1990)("Actions which do not depend on the bankruptcy laws for their existence and which could proceed in another court are not core proceedings.").

8. The Supreme Court has effectively overruled Pacor with respect to its holding that the prohibition against review of a remand order in 28 U.S.C. S1447(d) does not apply to a bankruptcy case. See Things Remembered Inc. v. Petrarca, 116 S.Ct. 494 (1995). The Supreme Court's ruling, however, did not disturb Pacor's holding regarding what constitutes a non-core proceeding. See Donaldson v. Bernstein, 104 F.3d 547, 554 n.1 (3d Cir. 1997). In fact, the Pacor non-core test has been widely followed by our sister circuits.

10

necessarily be against the debtor or against the debtor's property." In re Guild, 72 F.3d at 1180-81. " `A key word in [this test] is conceivable. Certainty, or even likelihood, is not a requirement. Bankruptcy jurisdiction will exist so long as it is possible that a proceeding may impact on the debtor's rights, liabilities, options, or freedom of action or the handling and administration of the bankrupt estate.' " Id. at 1181 (quoting In re Marcus Hook, 943 F.2d at 264) (emphasis omitted).

Barry and Irwin's consolidated action presented the Bankruptcy Court with five claims:

> 1. Barry sought a declaratory judgment that HBI's signing bonus is unenforceable because it was (a) part of an illegal stock redemption under N.J.S.A. 14A:7-14.1; (b) a fraudulent transfer under N.J.S.A. 25:2-20 et seq.; and (c) a fraudulent transfer under 11 U.S.C. S 548.

> 2. Barry sought a declaratory judgment that his personal Guaranty of the signing bonus is unenforceable because HBI's underlying obligation was void.

> 3. Conversely, Irwin sought a coercive judgment enforcing Barry's personal Guaranty.

> 4. Barry sought a declaratory judgment that, if th e signing bonus is enforceable, then HBI's obligation is limited to $75,000 under 11 U.S.C. S 502(b)(7).

> 5. Barry sought a declaratory judgment that his liability under the Guaranty should be coextensive with HBI's underlying signing bonus obligation as limited by S 502(b)(7).

To determine the extent of the Bankruptcy Court's jurisdiction in this case we must examine each of the five claims presented to ascertain if it is core, non-core, or wholly unrelated to a bankruptcy case. Barry's first claim, that HBI's signing bonus obligation is void as part of an illegal stock redemption or fraudulent conveyance, is a core matter that the Bankruptcy Court was empowered to resolve by a final judgment. This claim appears tofit within two of S 157(b)'s illustrative examples. Section 157(b)(2)(B)

11

states that core proceeding jurisdiction exists to determine the "allowance or disallowance of claims against the estate or exemptions from property of the estate . . ." 28 U.S.C. S 157(b)(2)(B). The claim seeks a declaration that any claim by Irwin against HBI under the Employment Agreement is unenforceable. Section 157(b)(2)(H) states that "proceedings to determine, avoid, or recover fraudulent conveyances" are core. Id. S 157(b)(2)(H). Barry specifically alleges that HBI's granting of Irwin's signing bonus was a fraudulent transfer under New Jersey and federal bankruptcy law. More importantly, Barry's claim to declare HBI's signing bonus obligation unenforceable satisfies this court's core proceeding test because it invoked the trustee's power to avoid fraudulent conveyances under S 548, a substantive provision of the bankruptcy code. Thus, we conclude that Barry's first claim "arises in a bankruptcy" and is a core claim.

The same cannot be said, however, for Barry's and Irwin's "reciprocal claims" concerning the Guaranty's enforceability. Irwin's claim is a state law claim for breach of a pre-bankruptcy contract to which the debtor was not a party. Similarly, Barry's claim for a declaratory judgment that he is not personally liable for a breach of that contract is predicated upon state law. Neither claim satisfies this Court's core proceeding test because neither invokes a substantive provision of the bankruptcy code and neither is the type of claim that can only be entertained in bankruptcy. Rather, these claims involve a dispute between two parties, neither of whom is the debtor, over a pre-petition contract between them. They must be resolved under New Jersey guaranty and contract law and could have been brought in state court. While Barry asserts that New Jersey would not enforce the Guaranty if HBI's underlying obligation is void under federal bankruptcy law, this does not render these claim core proceedings.

These claims are nonetheless "non-core" and therefore fall within the Bankruptcy Court's jurisdiction because their resolution could "conceivably affect" HBI's estate in bankruptcy. For instance, finding the Guaranty to be enforceable would provide Irwin, a creditor of HBI under the Employment Agreement, with an alternative source of

12

recovery effectively diverting his claims from the bankrupt estate. Because these claims are non-core, however, the Bankruptcy Court lacked the power to issue final judgment, but rather was limited to submitting proposed findings of fact and conclusions of law to the District Court.

Barry's alternative claim seeking to limit HBI's liability to $75,000 if HBI's signing bonus obligation is not found to be an illegal stock redemption or a fraudulent transfer is also a core proceeding. This claim appears to fall within S 157(b)(2)(B)'s example of "core" matters relating to the allowance and estimation of claims against the estate. 28 U.S.C. S 157(b)(2)(B). Moreover, this claim is brought by Barry as HBI's trustee in bankruptcy and invokes 11 U.S.C. S 502(b)(7), a substantive provision of the bankruptcy code. If the Court on remand finds the signing bonus to be an enforceable obligation of HBI, then the Bankruptcy Court would have core jurisdiction to entertain Barry's claim to limit HBI's liability under S 502(b)(7) and issue final judgment thereon.

Barry's related claim, that his personal liability under the Guaranty should similarly be limited to $75,000 to be co-extensive with HBI's underlying obligation, however, is a non-core matter. This claim does not appear to fit within any of S 157(b)(2)'s examples and it does not invoke a substantive provision of the bankruptcy code; nor is it the type of proceeding that can only arise in bankruptcy. Rather, this claim, like Barry's claim that the Guaranty is entirely unenforceable, depends upon New Jersey's guaranty and contract law, not the bankruptcy code, and could be resolved in state court. This claim does, however, fall within the Bankruptcy Court's non-core jurisdiction because it could conceivably affect HBI's bankruptcy estate.

As our discussion illustrates, this case presented the Bankruptcy Court with a mixture of core and non-core claims. This court has not yet addressed how to determine a Bankruptcy Court's jurisdiction where it is presented with mixed claims. Several courts have employed a claim by claim analysis to determine the extent of a Bankruptcy Court's jurisdiction. See, e.g., In re N. Parent, Inc., 221 B.R. 609, 626 (Bankr.D.Mass. 1998)("[E]ach of Debtor's fourteen causes of action will have to be separately analyzed to

13

determine whether it falls within the bankruptcy court's core jurisdiction."); In re Best Reception Systems, Inc., 220 B.R. 932, 946 (Bankr. E.D. Tenn. 1998)("[T]he court must examine each cause of action separately to determine if it is core or non-core."); In re 610 W. 142 Owners Corp., 219 B.R. 363, 367 (Bankr. S.D.N.Y. 1998)(employing claim by claim analysis); Ralls v. Docktor Pet Ctr's Inc., 177 B.R. 420, 425 n.6 (D. Mass. 1995)("A district court must scrutinize each count and each asserted right for relief to determine which ones were [core and] properly before the bankruptcy judge for final resolution and which ones [were non-core and] must receive de novo review.").

The Bankruptcy and the District Courts determined that the entire proceeding could be characterized as a core proceeding under S 157(b)(2)(B) and (O).9 The District Court reasoned:

On November 29, 1993, the Bankruptcy Court entered an Order providing Barry with standing to bring an action to avoid or reduce claims against the debtor's estate under the trustee powers of 11 U.S.C. S 548. The adversary proceeding filed by Barry requested, inter alia, a declaratory judgment that HBI's obligations created by the September 5, 1991 agreements were void as an illegal stock redemption of an insolvent corporation, and constituted a fraudulent conveyance under the Bankruptcy Code and New Jersey state law. Resolution of these proceedings thus required that the

_____

9. These subsections provide:

(b)(2) Core proceedings include, but are not limited to- . . .

(B) allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11, 12, or 13 of title 11 but not the liquidation or estimation of contingent or unliquidated personal injury tort or wrongful death claims against the estate for purposes of distribution in a case under title 11;

(O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

14

> Bankruptcy Court adjudicate not only a claim against
> a guarantor of the debtor's obligation, but also an
> analysis of the extent of the debtor's obligation from
> which the guarantor's obligation arose.

(Pa. 9-10). We believe the District Court's analysis reflects an alternative approach to determining the extent of a Bankruptcy Court's jurisdiction in mixed claims proceedings. It resembles the view of those courts which hold that "when a proceeding is in part a core proceeding and in part non-core, the courts may determine that the entire proceeding is core if the core aspect heavily predominates and the non-core aspect is insignificant." In re Blackman, 55 B.R. 437, 443 (Bankr. D.C. 1985); see In re Hughes-Bechtol Inc., 141 B.R. 946, 949 (Bankr. S.D. Ohio 1992); In re Cinematronics Inc., 111 B.R. 892, 901 (Bankr. S.D.Cal. 1990); In re Sibarium, 107 B.R. 108, 115 (N.D. Tex. 1989); In re GWF Investment, Ltd., 85 B.R. 771, 778 (Bankr.S.D.Ohio 1988). Other courts have expressly rejected or declined to follow the "predominantly core" approach. See, e.g., In re Best, 220 B.R. at 950; 610 W. 142 Owners Corp., 219 B.R. at 370; Glinka, 1994 WL 905714, at *10 & n.14.

We adopt the claim-by-claim approach as the only one consistent with the teachings of Marathon. This case well illustrates the point. In Marathon, as we have noted, a debtor in bankruptcy sued for breach of a pre-petition contract. The Court held that it would violate Article III for an Article I Bankruptcy Judge to adjudicate finally the tendered state law claim even though the plaintiff was a debtor in bankruptcy. Here, if we followed the approach of the Bankruptcy and District Courts, we would be required to sanction the entry of judgment by an Article I Judge on a pre-petition state law contract claim where neither party is in bankruptcy.

In sum, we conclude that the only core matters before the Bankruptcy Court were Barry's claims (i) that HBI's signing bonus obligation was unenforceable as an illegal stock redemption or fraudulent conveyance, and (ii) that, if HBI's signing bonus obligation was enforceable, HBI's obligation should be limited to $75,000 under S 502(b)(7). We agree with the District Court's conclusion that the

15

Bankruptcy Court had jurisdiction to enter a final order or judgment on these claims. However, the remaining claims regarding the Guaranty's enforceability and the extent of Barry's liability thereunder are non-core proceedings. The Bankruptcy Court did not have the power to issuefinal judgment on these claims, but rather was limited to submitting proposed findings of fact and conclusions of law to the District Court under S 157(c). Thus, the District Court erred in affirming the Bankruptcy Court's exercise of core proceeding jurisdiction to declare the Guaranty unenforceable as a violation of public policy.

## III. ERRONEOUS APPLICATION OF CONTRACT PRINCIPLES

Having affirmed the District Court's determination that the Bankruptcy Court had core proceeding jurisdiction to enter a final judgment on Barry's claim that HBI's signing bonus obligation was unenforceable as part of an illegal stock redemption or a fraudulent conveyance, we now consider the District Court's decision on the merits of that claim.

The Bankruptcy Court and District Courts employed substantially similar modes of analysis. The initial task was to determine the parties' intent utilizing traditional principles of contract law. After finding the text of the September Transaction documents ambiguous, the Bankruptcy Court considered the extrinsic evidence tendered at trial and made a factual finding that the parties' minds met on a redemption of Irwin's stock by HBI, and that the Purchase Letter effectuated this intended redemption.[10] Next, it considered whether the redemption

_____

10. We read the Bankruptcy Court's conclusion that a stock redemption was intended on September 5, 1991, and effectuated on April 15, 1992, to rest exclusively on its factual finding that this was what the parties intended. This is thus not a case where a court acknowledges that the parties intended one form of transaction, but treats the transaction in a different manner for reasons unrelated to the parties' intent. Compare Sedbrook v. Zimmerman Group, Ltd., 526 N.W.2d 758 (Wis. Ct. App. 1994)("de facto" merger); Fenderson v. Athey Prod's Corp. Kolman Div., 581 N.E.2d 288 (Ill. App. Ct. 1991)(same).

16

thus accomplished was consistent with New Jersey law. Based on its finding that HBI was insolvent at the time of the redemption, it held that the transaction violated N.J.S.A. 14A:7-14.1. The Bankruptcy Court then turned to consider whether the September Transaction constituted a fraudulent conveyance under 11 U.S.C. S 548 and N.J.S.A. 25.2-20, et seq. It was undisputed that the Agreement for redemption of Irwin's stock was entered within a year of the Bankruptcy Court's order of relief and at a time when the HBI was insolvent. The Bankruptcy Court focused upon the only remaining fraudulent transfer element: whether HBI "received less than reasonably equivalent value when it entered into the redemption agreement." Slip. 36. Because it was undisputed that the stock had a value of $1.00 or less, the Court concluded that HBI's obligation to pay Irwin $300,000 was a fraudulent conveyance. Finally, the Bankruptcy Court held that Barry's personal guaranty was unenforceable because it was a part of an integrated transaction involving an illegal stock redemption.

Tracing the steps of the Bankruptcy Court's analysis demonstrates that the foundation of its ultimate legal conclusions was its finding that the parties contracted for a stock redemption. We must respectfully disagree with this foundational premise. We find no ambiguity in the text of the documents and all of the extrinsic evidence relevant under New Jersey law is entirely consistent with the express and unambiguous intent reflected in those terms. While the parties intended that Irwin would grant an option to HBI that could result in a redemption, they did not intend for that option to be exercised at a time when HBI was insolvent. Moreover, all of the relevant evidence indicates that no redemption occurred.

We begin with basic principles of New Jersey contract law:

> Evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. This is so even when the contract on its face is free from ambiguity. The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the

17

attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing -- not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant. The judicial interpretive function is to consider what was written in the context of the circumstances under which it was written, and accord to the language a rational meaning in keeping with the expressed general purpose.

Atlantic Northern Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301 (N.J. 1953).

We next turn to the documents. The four simultaneously executed documents spell out carefully, and in great detail, the terms of an integrated transaction, the primary objectives of which were (1) to vest Barry with immediate control of HBI, (2) to provide Barry with the opportunity of becoming the sole stockholder of HBI and (3) to terminate any relationship between HBI and Irwin other than his employment relationship. To accomplish these objectives, the documents unambiguously provide, inter alia, for (a) the immediate transfer of Irwin's stock to Barry as voting trustee, (b) the granting of an irrevocable three year option to purchase Irwin's HBI stock exercisable by Barry, HBI, or an entity to be organized by Barry, (c) the employment of Irwin by HBI in a sales capacity, (d) the payment by HBI of a $300,000 signing bonus to Irwin, (e) Irwin's agreement to a restrictive covenant of non-disclosure and non-competition, (f) Irwin's resignation as an officer and director of HBI, and his release of all his rights under HBI's stockholder agreement and executive compensation plan, (g) the exchange of releases between Irwin on the one hand and Barry and HBI on the other, and (h) Barry's guaranty of HBI's signing bonus obligation. The Letter Agreement provided that Irwin's rights under the Employment

18

Agreement (including the signing bonus) were being given to him in consideration for his agreement to enter the overall transaction (e.g., his commitments to transfer his stock to the voting trust, to grant the irrevocable option, to provide services, to release his rights, etc.).

Barry signed the Letter Agreement, both individually and as HBI's president. (Pa. 533) On January 15, 1992, Barry exercised the stock buyout option by sending a letter signed in his individual capacity, to himself, as voting trustee, and to Irwin stating: "[Y]ou are hereby notified that I elect to exercise my option to acquire all of the shares of stock in Halper Bros., Inc., which are held by the Voting Trustee pursuant to the Voting Trust Agreement." (Pa. 526)(emphasis added).

Discussing the preamble of the Letter Agreement, the Bankruptcy Court noted:

> The plain language of [statement (i)] fails to delineate whether the transaction is a sale of stock by an individual shareholder or a redemption of the Debtor's stock by the Company. The text also fails to stipulate who is the purchaser of the stock, the Debtor, or Barry or an entity controlled by Barry. The signature portion of the Letter Agreement also offers no assistance to the Court as it was executed by Barry, individually, and Barry in his capacity as president of the Debtor.

(Pa. 51)

While the above statements are true, these facts do not make the Letter Agreement ambiguous or inconsistent. Rather, the precise language of the Letter Agreement creates the unambiguous possibility of either a sale or a redemption of the stock to any one of the three potential purchasers. Because Barry assumed sole control of HBI immediately upon the agreements' execution, this meant that Barry had a choice: he could purchase the stock individually, acquire the stock through an entity controlled by him, or cause HBI to redeem the shares. Any of the three methods would accomplish the undisputed primary objective of making Barry HBI's sole shareholder. The fact that a choice of method existed does not create an ambiguity by itself. If Barry or an entity controlled by Barry

19

exercised the option to purchase Irwin's shares, the transaction would constitute a personal purchase and sale of stock between shareholders. However, if, and only if, HBI exercised this option, the transaction would constitute a redemption. Because Barry signed the Purchase Letter in his individual capacity and stated that he elected to exercise his option, this transaction constituted a personal purchase of the stock, not a redemption by HBI.

Moreover, an examination of all of the extrinsic evidence confirms, rather than conflicts with, the intent evidenced in the documents. The cousins had previously declined to enter a transaction in which the benefit to them came solely through a redemption of their stock because they were aware that such an agreement would be unenforceable during any period of insolvency. This rejection as well as Barry's desire to secure a tax deduction for HBI resulted in a compromise. To appease the selling cousins, their stock could be purchased by Barry or a new Barry-created entity. These potential purchasers--unlike HBI--could exercise their options while HBI was insolvent. To accommodate Barry's tax concern, payment for this option would come through HBI as a deductible signing bonus. Finally, the selling cousins' concerns regarding HBI's ability to pay the signing bonus were allayed by Barry's personal guaranty thereof.

In short, based on the September Transaction documents, the extrinsic evidence, and the unambiguous terms of the Purchase Letter, we conclude that (1) Irwin granted an option to HBI that could be exercised if Barry infused capital and turned the business around, but which all recognized could not be exercised during insolvency, (2) Irwin granted Barry an option to purchase his shares which Barry exercised, and (3) there was no stock redemption.

In reaching this conclusion we are not unmindful of the fact that the Bankruptcy Court credited the testimony of Barry and his lawyer that they intended the Purchase Letter to be an exercise of HBI's option to buy Irwin's stock. We accept that factual finding for present purposes. Under New Jersey law, however, Barry's subjective intent is not legally relevant. The undisclosed subjective intent of a participant in a transaction cannot be used to alter the

20

intent clearly manifested in the documents to which he subscribed. See Atlantic Northern, 12 N.J. at 301. The Bankruptcy Court's reliance on that evidence was therefore error.

As we have earlier noted, the Bankruptcy Court's erroneous determination that the transaction constituted a stock redemption was the basis for its judgment that the stock transfer was illegal and that the Guaranty was unenforceable. It follows that we must reverse the District Court's judgment and remand with instructions that there be further proceedings.

IV. THE REMAND

Our conclusion does not, of course, resolve this controversy. A number of issues remain to be resolved on remand. The first of these is Barry's claim that the signing bonus was a fraudulent conveyance under 11 U.S.C. S 548. We have held only that the $300,000 signing bonus was not a fraudulent transfer as consideration paid by HBI to Irwin for stock found by the Bankruptcy Court to be worth $1.00 per share or less in a stock redemption. The Bankruptcy Court's focus was upon the value of Irwin's stock. On remand, it must focus on the value of the consideration to be given by Irwin under the terms of the September Transaction as we have interpreted them and on the extent to which HBI, rather than Barry, was to receive that consideration. As we have heretofore also held, this fraudulent transfer claim is a core proceeding because Barry as trustee invokes 11 U.S.C. S 548. Thus, it may be entertained by the District Court or it may be referred to the Bankruptcy Court for adjudication under 28 U.S.C. S 157(a).

Second, the Guaranty's enforceability must be considered on remand to resolve Barry's claim for a declaratory judgment of unenforceability and Irwin's reciprocal claim for a coercive judgment enforcing the Guaranty. Further consideration is required for two reasons. First, we have determined that the Bankruptcy Court was without jurisdiction to enter judgment and further proceedings are required before the District Court to resolve this "non-core"

21

matter. Second, it may be necessary on remand to reevaluate the circumstances in which the transaction was entered in the light of our reading of the relevant documents. As we have indicated, the Bankruptcy Court viewed the September Transaction as intended to syphon off $300,000 in corporate funds in return for virtually worthless stock while HBI was insolvent. It would seem permissible to us, however, for a fact finder to determine on this record that the September Transaction was not entered for the purpose of defrauding creditors. The transaction gave Barry a variety of options, each of which, depending on the circumstances that unfolded, could be executed in a manner consistent with public policy. The parties knew that if Barry chose to infuse capital these arrangements would be wholly consistent with the rights of HBI's creditors. They may also have intended that if Barry decided not to make the necessary capital infusion, the signing bonus would not be paid by HBI, but rather the consideration for Irwin's various commitments would come personally from Barry's pocket under the Guaranty without prejudice to creditors.

We do not here decide that the intention of the parties in September of 1991 is relevant to the enforceability of the Guaranty under New Jersey law. We leave it to the District Court (with the assistance of the Bankruptcy Court if it so chooses) to determine the applicable New Jersey law including the significance, if any, of the parties' intent at the time the Guaranty was made. We note, however, that there is some New Jersey case law supporting the proposition that unconditional guarantees that extend a guarantor's responsibility beyond that of the primary obligor are enforceable. The Superior Court in National Westminster Bank NJ v. Lomker, 649 A.2d 1328 (N.J. Super. Ct. App. Div. 1994), for example, held that a guarantor's liability may exceed that of the principal under New Jersey law. See id. at 1332 ("The liability of a guarantor is measured by that of the principal, unless the agreement explicitly provides otherwise."). In dicta, the court even entertained the possibility that a guarantor could explicitly waive the defenses of bad faith, fraud or conspiracy. See id.; see also Nation Wide, Inc. v. Scullin, 256 F. Supp. 929, 932 (D.N.J. 1966)("However harsh a

22

bargain it may seem in retrospect, the defendants' obligation was voluntarily assumed and made absolute by its terms."); Midatlantic Bank, N.A. v. Strong, 1996 WL 697940, *5 (E.D.N.Y. 1966)("[E]ven absolute, unconditional guarantees are upheld and enforced by New Jersey courts."); Lenape State Bank v. Winslow Corp., 523 A.2d 223, 231 (N.J. Super. Ct. App. Div. 1987)(upholding unconditional guaranty under New Jersey law); cf. Interchange State Bank v. Rinaldi, 696 A.2d 744, 748 (N.J. Super. Ct. App. Div. 1997)(finding guaranty unconditional even in absence of term "unconditional"). Here, Barry's Guaranty explicitly provided that Barry waived:

> any and all defenses of HBI and [Barry], including, without limitation, any and all defenses now or hereafter arising or asserted by reason of (a) any lack of power, capacity or authority of HBI with respect to the Employment Agreement, the Letter Agreement or the Obligations or any part thereof; (b) the unenforceability of the Employment Agreement, the Letter Agreement or the Obligations against HBI

> * * * * *

> Notwithstanding anything else contained in this [Guaranty] Agreement, [Irwin]'s rights and [Barry]'s obligations under this Agreement shall be reinstated and revived, and the enforceability of this Agreement shall continue, with respect to any amount at any time prior to or after the date of this Agreement paid on account of the Obligations which thereafter shall be required to be restored or returned by [Irwin] under any bankruptcy, fraudulent conveyance, insolvency or reorganization laws or for any other reason all as though such amount had not been paid.

(Pa. 535-36). The court on remand should consider whether this express language is enforceable under New Jersey law under the circumstances of this case.11

_____

11. The Bankruptcy Court, in the course of holding that the Guaranty was unenforceable against public policy, concluded that the Guaranty was not "severable" from the September Transaction's other documents. Irwin did not challenge this conclusion on his appeal to the District

Finally, if the court determines that HBI's signing bonus obligation was not a fraudulent conveyance, the court must then consider Barry's alternative claim that 11 U.S.C. S 502(b)(7) limits HBI and Barry's liability under the Guaranty to $75,000. The claim that HBI's obligation is limited to this amount is a core proceeding because it invokes a substantive provision of the bankruptcy code and may be decided in the first instance by the District Court or the Bankruptcy Court. Barry's derivative claim that his Guaranty liability should be similarly limited, however, is a non-core claim upon which only the District Court can issue final judgment. Nonetheless, the District Court may refer the claim to the Bankruptcy Court for proposed findings of fact and conclusions of law.

V. CONCLUSION

The judgment of the District Court will be reversed and this matter will be remanded to it for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

_____

Court and Barry insists that he thereby waived any claim that the Guaranty was enforceable even if HBI's commitment to pay the signing bonus was unenforceable. We are unpersuaded. Irwin consistently maintained before the District Court, and before us, that the Guaranty, including the above-quoted portions, should be enforced in accordance with its literal terms.

24