**In re ADVANCED TELECOMMUNICATION NETWORK, INC., Debtor.**

**Advanced Telecommunications Network, Inc., a New Jersey Corporation, Plaintiff,**

v.

**Daniel W. Allen and David D. Allen, Defendants.**

**Bankruptcy No. 6:03–BK–0299–KSJ. Adversary No. 6:03–AP–122.**

United States Bankruptcy Court, M.D. Florida, Orlando Division.

Feb. 18, 2005.

Jimmy D. Parrish, Mariane L. Dorris, Gronek & Latham LLP, Orlando, FL, for Advanced Telecommunication Network, Inc.

Miriam G. Suarez, Lead Attorney, United States Trustee, Orlando, FL, for Trustee.

J. Michael Grimley, Galloway, Johnson, Tompkins, Burr & Smit, Gulf Breeze, FL; Phillip M. Hudson, III, Arnstein & Lehr LLP, Miami, FL, for Daniel W. Allen and David D. Allen.

## *FINDINGS OF FACT AND CONCLUSIONS OF LAW*

KAREN S. JENNEMANN, Bankruptcy Judge.

This adversary proceeding came on for trial on October 6, 7, and 28, 2004, on the Amended Complaint (Doc. No. 163) filed by the debtor/plaintiff, Advanced Telecommunication Network, Inc. ("ATN"), against the defendants, Daniel W. and David D. Allen (the "Allens"), and on the Counterclaim (Doc. No. 128) filed by the Allens. The Allens are brothers and former shareholders of the debtor. After years of litigation between the Allens, ATN, and Gary Carpenter, the only other shareholder at that time, the litigants finally settled their dispute in December 1998. The Allens and their attorneys received several million dollars in exchange for the Allens' stock in ATN. ATN made all of the payments required under the settlement. ATN now seeks to avoid these payments as well as the underlying Agreement, asserting, among other theories, that the transfers were fraudulent transfers. The court concludes that the settlement was appropriate and that the transfers are not avoidable under any theory. The court will enter a judgment in favor of the Allens and against ATN.

ATN filed this adversary proceeding against the Allens on April 28, 2003. A three-day trial was held on October 6, 7 and 28, 2004, upon ATN's thirteen-count Amended Complaint (Doc. No. 163). The first six counts assert various fraudulent transfer claims brought by ATN under the relevant New Jersey statutes adopting the Uniform Fraudulent Transfer Act

("UFTA").[1] Of course, ATN must rely on Sections 544 and 550 of the Bankruptcy Code[2] in order to assert these state law claims against the Allens.

New Jersey law has one odd quirk. The New Jersey version of UFTA appears to distinguish between an actual *transfer* sought to be avoided and situations where a party incurs an *obligation* that is sought to be undone. Because of this unique dichotomy between avoidable transfers and avoidable obligations, the New Jersey UFTA contains dual statutory provisions for both actual and constructive fraudulent transfers. For example, New Jersey Statutes Section 25:2–27(b) allows a party to allege constructive fraud to avoid both a "transfer" and an "obligation." Because of this duality, ATN has alleged two counts for each type of fraudulent transfer claim. One count asserts the "transfer" is avoidable. The second count asserts the "obligation" is avoidable.

With that short statutory explanation, the counts alleged in ATN's Amended Complaint can be summarized as follows:

- Counts 1 and 2 assert constructive fraud counts under N.J. STAT. ANN. § 25:2–27(b) assuming present creditors existed prior to the incurrence of the obligations or transfers sought to be avoided. Count 1 seeks to avoid obligations; Count 2 seeks to avoid transfers.

- Counts 3 and 4 assert claims for actual fraud pursuant to N.J. STAT. ANN. § 25:2–25(a) and, again, are broken down into the dichotomy between obligations and transfers.

- Counts 5 and 6 assert constructive fraud claims brought pursuant to N.J. STAT. ANN. § 25:2–25(b)(2) assuming that either present *or* future creditors exist to avoid the alleged obligations or transfers. Again, the counts are divided between transfers and obligations.

- Count 7 asserts a claim for improper shareholder distributions pursuant to N.J. STAT. ANN. § 14A:7–14.1.

- Count 8 asserts a claim against Daniel Allen for breaching the fiduciary duty he owed to ATN and against David Allen for aiding and abetting Daniel in the breach of his fiduciary duty.[3]

- Count 9 asserts a claim for conflict of interest under N.J. STAT. ANN. § 14A:6–8.

- Count 10 asserts a claim for unjust enrichment under New Jersey law.

- Count 11 asserts a claim for an accounting under New Jersey law.

- Count 12 asserts a claim for turnover under Section 542 of the Bankruptcy Code.

- Count 13 asserts a claim for equitable subordination against Daniel pursuant to Section 510 of the Bankruptcy Code.

In response to ATN's Amended Complaint, the Allens jointly filed their amended answer, affirmative defenses, and counterclaim on June 24, 2004 (Doc. No. 128). Regarding ATN's allegations that they received actually or constructively fraudulent transfers and received improper shareholder distributions, the Allens raise two affirmative defenses. First, the Allens argue that ATN's avoidance claims are

---

1. The parties agree New Jersey law controls the resolution of the issues asserted in this adversary proceeding.

2. All references to the Bankruptcy Code refer to 11 U.S.C. Section 101, *et seq.*

3. Because this litigation involves two brothers, Daniel Allen and David Allen, with identical last names, the court, with due deference and no intent of disrespect, will refer to these parties by their first names—Daniel and David, when appropriate.

barred by the applicable statute of limitations. Second, the Allens assert that ATN's avoidance claims must fail because ATN failed to sue the initial transferee, Gary Carpenter. The Allens argue that the monies paid to them under the Agreement was financed not by ATN directly but by Carpenter via a loan from ATN. As such, Carpenter was the initial transferee of the funds paid by ATN and, pursuant to Section 550 of the Bankruptcy Code, ATN first must avoid this transfer before seeking to avoid the subsequent transfer to the Allens.

In the Counterclaim, the Allens assert ATN is required to indemnify them for all attorneys' fees and costs the brothers incurred in defending this litigation. The requested fees exceed $700,000.

### ATN's History and Business

Daniel and Gary Carpenter co-founded ATN in 1989. In its industry, ATN is called a long distance reseller. ATN purchases long distance telephone service in bulk from larger carriers and then resells the services to customers. Initially, ATN's customers primarily were commercial businesses. ATN then migrated to providing long distance telephone service to residential consumers. Many similar start-up companies got into this new business in the early 1990's. Only a few succeeded.[4]

From ATN's inception through August 14, 1996, Daniel held the title of either president or vice-president. He owned 50% of the voting stock of ATN and continued as ATN's secretary and as a director through early 1999. Similarly, Carpenter also held the titles of president or vice-president of ATN from the company's incorporation through October, 2000. Carpenter was also a director and was the other 50% owner of ATN's voting stock. David Allen and Carpenter's father, Robert Carpenter, owned the balance of ATN's non-voting stock.[5]

For several years, Carpenter and Daniel worked together running ATN. David also worked at ATN for a short time, but he never held a position as officer or director, and he never held any management authority. David resigned as an employee with ATN sometime in 1995, before any of the relevant events occurred. However, David continued to own 10% of ATN's non-voting stock, which is the reason he participated in the challenged settlement.

Not unlike other closely held small corporations involved in a new and constantly changing industry, disputes arose between Daniel and Carpenter. The disputes festered and eventually erupted into a full blown war. In April 1996, Carpenter, then president of ATN, placed Daniel on administrative leave and effectively denied Daniel access to ATN's business offices or financial information. ATN, however, continued to pay Daniel his salary until August 14, 1996, when Carpenter wrote a letter to Daniel reading, in part, as follows:

> Effective 3:30 p.m., August 14, 1996, your employment with ATN is terminated. Your salary ends at the close of the business day on August 14, 1996.

(Defendants' Exh. No. 23).

After this letter, Daniel remained only the corporate secretary, a director, and a

---

**4.** Indeed, Vince Shea, one of the experts who testified at the trial of this adversary proceeding, opined that, in 1996, ATN was one of literally hundreds of long distance companies reselling long distance telephone services. By 1999, ATN was one of only three remaining resellers of AT & T long distance services.

**5.** Robert Carpenter owned 20% of ATN's stock, all non-voting. David Allen owned 10% of ATN's stock, again non-voting. Gary Carpenter and Daniel Allen each owned 35% of ATN's stock, all voting.

shareholder of ATN until 1999. (Defendants' Exh. No. 79, Deposition of Gary Carpenter, September 16, 2004, pps. 71, 79). Daniel stayed marginally informed about ATN's financial performance, primarily through the shareholder litigation and the attendant discovery. Neither Carpenter nor ATN provided Daniel with any current financial information relating to the company's operations after August 1996.

## Shareholder Litigation and Settlement Agreement

In April 1996, Daniel Allen sued ATN and Gary Carpenter in the state courts of New Jersey.[6] (Plaintiff's Exh. No. 1). The Amended Complaint filed by Daniel in the shareholder litigation contains an eerily similar 13 counts against both Carpenter and ATN. In its simplest form, the Amended Complaint raises control issues over who should run ATN—Daniel or Carpenter. However, the complaint also raises direct claims against ATN, particularly for the reimbursement of attorney fees incurred by Daniel in connection with the litigation and for the forced sale of ATN's stock.

Due to the deadlock in ATN's management caused by the litigation between the equal voting shareholders, the New Jersey state court appointed a third director—Milton Leontiades. Mr. Leontiades, the dean of Rutgers Law School, played a role in helping the company obtain financing, but was not involved in the company's day-to-day management. Nor was he directly involved in the shareholder litigation or its resolution. Yet, somehow, ATN continued to operate in spite of the pending dispute between the shareholders.

The trial in the shareholder suit started in December 1998. ATN actively participated in the trial and had its own separate set of lawyers. In the midst of the evidentiary presentation, on December 23, 1998, the parties settled the case. Attorneys for the Allens and for Carpenter[7] each signed a short, handwritten settlement agreement that provides, *in toto,* as follows:

Carpenter/Allen 12/23/98

$1 M by 12/31/98 to Flaster [The Allens' Attorneys[8]]

$250 K by 1/5/99 to Flaster

$250K by 1/31/99 to Dan/David for stock

$6 M + Stockholder Loan to Allens by 6/1/99

Stockholders (Allens) Pay Off Debt at Closing

$100 K from ATN to Flaster by 12/31/99

Stip. Of Dismissal with Prejudice upon Execution

Default per Spirgel

Distribution of Tax Money as historical—on or before 4/15/99

Upside through 12/31/99 as per Spirgel ltr

Signed by the Attorneys for Daniel Allen, David Allen and Gary Carpenter—12/23/98

The parties intended this agreement to bind all litigants involved in the shareholder litigation, including ATN. They had reached a total, global settlement. The ongoing trial was stopped. The judge was given a copy of the handwritten agree-

---

6. *Daniel W. Allen v. Gary K. Carpenter and Advanced Telecommunication Network, Inc.,* Case No: 55–96, filed in the Superior Court of New Jersey, Chancery Division, Camden County.

7. ATN's lead attorney did not sign this handwritten agreement.

8. The firm's complete name was Flaster, Greenberg, Wallenstein, Roderick, Spirgel, Zuckerman, Skinner and Kirchner, P.C. Peter R. Spirgel was the primary attorney handling the litigation on behalf of the Allens.

ment, but no further court approval was sought.

The essential terms of the settlement are simple. The Flaster law firm immediately was to receive $1,250,000 in payment of attorney fees. ATN also was required to pay $100,000 of additional attorney fees to the Flaster firm within the year and no later than December 31, 1999. The Allens were to receive $250,000 by January 31, 1999, and an additional $6 million no later than June 1, 1999, in exchange for the transfer of their stock in ATN. ATN also was required to forgive all debts due by the Allens to the company, in an approximate amount of $1.6 million, and advance any funds needed by the Allens to pay for any tax liability arising from their ownership of ATN.[9] In addition to the stock exchange, ATN significantly benefited from the settlement by the cessation of litigation between its two controlling shareholders. ATN got the chance to refocus its efforts on its business and improving its operations. Because the short handwritten agreement did not define numerous details, all parties expected a formal written agreement would follow. However, the court specifically finds that ATN (in addition to Carpenter and the Allens) incurred a substantial obligation under the handwritten agreement, executed on December 23, 1998. Only the details remained to be documented.

The formal written agreement, a 23-page typed document, was promptly drafted and signed by the parties on January 12, 1999 (the "Agreement") (Plaintiff's Exh. No. 6). This time, Carpenter expressly signed the Agreement on behalf of ATN as the company's president. Daniel signed as ATN's secretary. In addition, Robert Carpenter, Gary's father, signed the document as did David Allen and Mr. Spirgel, the escrow agent appointed under the Agreement. (Plaintiff's Exh. No. 46.) Both Carpenter and Daniel also signed the Agreement individually and, separately, a Consent Action on behalf of the shareholders approving the actions required under the Agreement. (Plaintiff's Exh. No. 44). Daniel further signed a formal resignation as an officer, director, and employee of ATN effective January 12, 1999. (Plaintiff's Exh. No. 45).

The Agreement included all of the terms outlined in the earlier handwritten agreement and merely provided additional albeit substantial detail. For example, under both the handwritten and typed agreements, the Allens were required to relinquish their stock in ATN in exchange for a payment of $6,250,000 made in two installments. The typed Agreement specifically provided the additional information that ATN was to make these payments and that the price payable to the Allens was subject to adjustment if the value of ATN's stock increased. (Plaintiff's Exh. No. 6, pp. 2.2.2). Carpenter (as well as ATN) guaranteed payment of the full purchase price and performance of all other obligations required under the Agreement.

The typed Agreement also confirmed ATN's acknowledgement that the company's bylaws require the indemnification of the Allens for their legal fees and associated costs they had incurred in connection with the shareholder litigation. (Plaintiff's Exh. No. 6, Art. 6). In total, ATN eventually paid $1,350,000 to the Flaster firm for

9. ATN is a Subchapter S corporation. As such, equity owners often incur "double" taxation. The corporation pays tax on any income generated. The individual owners then also must pay taxes on income attributed to them from the corporation. In order to address this negative tax consequence, ATN, in the past, routinely paid the extra tax liability incurred by the individual equity owners as a result of ATN's income. The settlement agreement here contemplated that ATN would continue this practice for tax year 1999.

fees and costs incurred by the Allens in the shareholder litigation.[10]

The Agreement also provided additional information on the forgiveness of the loans due by the Allens to ATN at the time of the settlement. The total of the Allens' loans payable to ATN plus accrued interest was approximately $1.6 million.[11] ATN made two series of entries in its financial records relating to the forgiveness of these loans.

In the first series of entries, ATN made one entry showing a payment to the Allens in the full amount of the shareholder loans. Next, ATN reflected a corresponding payment by the Allens to ATN. However, these two book entries are purely fictional insofar as no monies relating to the shareholder loans ever transferred between the Allens and ATN.

Rather, the true events are reflected in the second series of entries made by ATN relating to the Allens' shareholder loans. Instead of actually eliminating the Allens' liability to ATN, ATN made entries reflecting that the loans receivable previously payable by the Allens were assumed by Carpenter. Essentially, Carpenter agreed to remain liable for the Allens' loans.

To protect the Allens in the event that ATN did not make the required payments, Paragraph 2.8.2.2 of the Agreement provides that the Allens are entitled to recover attorney fees and other associated costs and expenses if the Allens were required to hire lawyers "for the collection of payments due or to become due under this Agreement, or for the enforcement of performance or observance of any obligation or agreement on the part of the Carpenter Parties [which includes ATN]." If any such fees or costs are incurred by the Allens, ATN granted the Allens a security interest in all of its assets to guarantee the repayment of these fees and costs. (Paragraph 2.7.2.3 of the Agreement).

Lastly, the parties exchanged broad releases in Article 9 of the Agreement. The releases encompassed "any claims, demands, debts, damages, liabilities, obligations, actions, or causes of action of any nature whatsoever whether known or unknown, that now exist or may arise in the future arising from any act or omission occurring from the beginning of time through the date of this Agreement, other than obligations arising pursuant to the Agreement."

### Payment of Amounts Required under Agreement

All parties timely performed all of the obligations required under the Agreement. ATN paid a total of $1,250,000 to the Flaster firm on or about the date the Agreement was signed and an additional $100,000 paid in three later installments.[12]

10. ATN also paid all of the attorney fees and costs paid by Gary Carpenter individually in connection with the Allens' shareholder litigation. (Defendants' Exh. No. 79, Deposition of Gary Carpenter, September 16, 2004, pps. 24–25).

11. ATN's audited financial statements for the year ending 1998 reflect, in note 20, that "the remaining majority stockholder [Carpenter] assumed the selling stockholders' [the Allens'] loans payable to the corporation in the amount of $1,588,645." (Defendants' Exh. No. 73). ATN in its complaint argues that the outstanding loans plus interest owed by the Allens totaled a higher amount: $1,963,480. Because the court need not resolve the discrepancy between these two amounts to resolve the issues raised in this adversary proceeding, the court simply will estimate the Allens' outstanding shareholder loans at $1.6 million. The exact amount is not relevant.

12. The Flaster firm received $1,250,000 prior to January 29, 1999, and also received the additional $100,000 due under the Agreement in three installments paid on February 11, March 31, and April 12, 2000, in increments of $10,000, $50,000, and $40,000, respectively.

ATN paid the Allens $250,000 on January 12, 1999, and an additional $6 million [13] on June 1, 1999.[14]

The company's audited financial statements, dated December 16, 1999, for the fiscal year ending December 31, 1998, reflects, in note 20, that the payments received by the Allens were made by ATN "on behalf of the remaining majority stockholder [Carpenter] and...were recorded by the corporations as a loan receivable from the remaining majority stockholder." (Defendants' Exh. No. 73). However, at the time of the transfers to the Allens, the monies went directly from ATN to the Allens. No monies ever went through any individual account owned by Carpenter. (Defendants' Exh. No. 79, Deposition of Gary Carpenter, September 16, 2004, pp. 100).

ATN reflected these payments as a loan to Carpenter only *after* the transfers to the Allens were completed. Post-transfer, Carpenter signed two promissory notes payable to ATN. One note, dated January 17, 1999, was for $250,000. The second promissory note, dated June 1, 1999, was in the amount of $6 million. (Defendants' Exh. Nos. 11 and 12). Both notes were drafted and signed by Carpenter sometime *after* June 1, 1999. The notes were dated retroactively by ATN to make the transfers reflect reality—that Carpenter bought the Allens' stock in exchange for agreeing to repay ATN $6,250,000, in addition to assuming the Allens' shareholder loans of $1.6 million. Carpenter truly intended to repay the large debt he now owed to ATN and anticipated he would repay the loans

with interest. (Defendants' Exh. No. 79, Deposition of Gary Carpenter, September 16, 2004, pps. 72–74).

Of course, Carpenter's ability to repay the loans was directly tied to his ability to improve ATN's profitability. If the company succeeded, Carpenter prospered. Conversely, if ATN failed, so did he. Carpenter certainly had no independent income or assets available to repay the substantial shareholder loans. However, Carpenter credibly believed that he would and could repay the loan through ATN's success and the attendant income or dividends paid by ATN or by the further sale of his controlling interest in ATN. The rationale underlying the shareholder settlement was that Carpenter would be able to run ATN without interference or distraction. Given that opportunity, Carpenter reasonably believed both he and ATN would profit.

However, Carpenter's later agreement to repay ATN for the transfers to the Allens does not discount the reality that ATN, not Carpenter, initially made all of the payments. Further, Carpenter never agreed to repay ATN for any of the $1,350,000 in payments made to the Flaster firm. The court finds that, although the Allens were not involved in the mechanics of how ATN and Carpenter gather the money, they, and everyone involved in management at ATN, knew the monies could only come from ATN.

ATN had to quickly gather a large amount of cash, over $7.8 million, to pay the Allens and the Flaster firm. In order

---

**13.** Of the $250,000 paid to the Allens in January 1999, Daniel received $195,000 and David received $55,000. Of the $6 million paid to the Allens on June 1, 1999, Daniel received $4,680,000 and David received $1,320,000.

**14.** ATN also made two additional *de minimus* transfers to the Allens in 2000. On January

14, 2000, ATN transferred $3,155 to David Allen and $9,860 to Daniel Allen. These payments to the Allens were to provide them with funds to pay their portion of ATN's tax liability allocated to them under the Subchapter S tax regulations.

to accumulate the cash, ATN delayed paying some of its regular bills for a short period of time. (E.g., Plaintiff's Exh. Nos. 7–12, 14, 15, 22, 24). As Phil Krieger, ATN's Chief Financial Officer, noted in his e-mail to Carpenter, dated May 17, 1999, "FYI. . .will need to cut back on payments for next two weeks. . .money for Dan is going to be awfully tight." (Plaintiff's Exh. No. 24). Krieger echoed his concerns in an e-mail he sent to several ATN employees, including Carpenter,[15] on May 20, 1999:

> We will need a substantial portion if not all of the funds that ATN currently has in order to meet the 6/1 payment. We hopefully will have a line of credit in place by that time, but it will not cover the full 6 million. As soon as ATN knows the status of the line and what cash will be available, then I can make a decision on what needs to be done. This of course will be done in conjunction with Gary. If this thing goes down to the last minute, which we should all expect it will, then that is reality and we will have to deal with it.

(Plaintiff's Exh. No. 25). Obviously, ATN was using all of its cash resources to make the additional $6 million payment to the Allens required on June 1, 1999.[16]

Carpenter estimated that, on June 1, 1999, ATN had only $453 in its checking account.[17] Both ATN's landlord and its insurance carrier were threatening to cancel their agreements. Other vendors also were threatening to withhold services.

However, ATN continued to generate revenue and, by June 7, ATN undisputedly had over $500,000 in its checking account. There is no reason to suspect that ATN could not have returned to financial health after making the transfers under the Agreement. Carpenter believed in the company and in his ability to substantially increase its revenue. After putting the shareholder litigation behind him and with the payments to the Allens completed, the court finds that, although ATN certainly needed additional income to pay all outstanding bills due on June 1, 1999, ATN's business was one that generated substantial cash in short periods of time. The company's cash balance changed rapidly. ATN's status of slow pay during June 1999, does not demonstrate a permanent inability to pay its bills, but, instead, reflects a temporary drain on its cash flow.

### WATS/800 Lawsuit

Unfortunately, ATN did not get a break after the settlement with the Allens. Competition remained fierce. The company almost immediately was immersed in more hostile litigation—this time involving a competitor, WATS/800, Inc.[18] Although the litigation had started in 1995, the battle really did not heat up until after the settlement with the Allens. The dispute between ATN and WATS revolved around the existence or nonexistence of a contract between two competing resellers of telecommunications services and various related fraud counts. Damian Freeman, the

---

**15.** The e-mail was sent to Gary Carpenter, Woody Baldwin, and Linda McMullen, ATN's Controller.

**16.** For example, ATN used substantial prepaid deposits made by customers involved in ATN's newly acquired Business Discount Plan service. The premature use of these deposits required ATN to later generate additional cash needed to pay on-going costs associated with supplying the BDP service in the future.

**17.** However, ATN's expert, William Cuthill, opined that ATN had a much larger cash balance of approximately $995,000 on June 1, 1999.

**18.** The case was styled as *WATS/800, Inc. v. ATN, Gary Carpenter and Daniel Allen,* case number 95–5822, filed in the United States District Court for the District of New Jersey.

then-president of WATS and the current president of ATN, made all strategic decisions during the litigation.[19]

In addition, another corporate entity, Investment Partners LLP, filed suit against ATN. Investment Partners had lent money to WATS and obtained a security interest in WATS' customer list. When WATS sold this asset to ATN, which started the litigation between ATN and WATS, Investment Partners asserted that their collateral was improperly transferred. As such, Investment Partners also sued ATN asserting a security interest in the customer list sold by WATS to ATN. They alleged a secured claim of approximately $3 million.

As early as January 5, 1998, a year before ATN settled the lawsuit with the Allens, ATN's counsel had advised ATN that the company had significant exposure, with a then pending settlement offer on the table of $2 million. (Plaintiff's Exh. No. 31). The attorney noted that, although ATN could be successful, "Discovery to date indicates that there is a substantial risk that the plaintiff could be successful on all, or part of this claim at the time of trial. Since plaintiff has asserted claims for fraud there is also the possibility, while remote, of punitive damages." On a more positive note, on September 30, 1999, the district court granted summary judgment in *favor* of ATN on several counts, but ruled that the various fraud counts would be tried before a jury,

finding that "there is, however, evidence that could lead a reasonable fact finder to believe that defendant ATN committed fraud." (Plaintiff's Exh. No. 33). No trial ever occurred.

ATN settled its litigation with WATS on October 19, 2000, about 18 months after the Allens' settlement. The WATS settlement is contained in a consent judgment and related findings of fact and conclusions of law submitted by the parties for the district court to review and sign. (Plaintiff's Exh. No. 47). There is no indication that the district court judge evaluated the contents of the findings other than agreeing to sign them based upon the parties' settlement. In any event, the judgment awarded treble damages to WATS of $39,927,083.86 under the fraud claim, and $12,739,978.32 on the breach of contract claim. Investment Partners was awarded a judgment of $10,156,726.66.

However, the judgment further reflected that the parties had reached an accord that WATS would accept an award of $10.5 million—$6 million payable to WATS and $4.5 million payable to Investment Partners.[20] Ultimately, Carpenter, acting on behalf of ATN, executed a promissory note payable[21] to WATS for only $5.5 million, even though ATN's agreed liability to WATS was $6 million. (Defendants' Exh. No. 21). The $500,000 reduction is attributable to ATN assigning to WATS and Investment Partners the claims ATN held

**19.** During the pendency of the WATS/ATN litigation, WATS, itself, filed a Chapter 7 bankruptcy case in the Middle District of Florida, Case No. 96–4611. One of Freeman's other companies, WATS/800 Holdings, Inc., purchased the interest of the Chapter 7 trustee in pursuing the WATS claims against ATN for a single payment of $10,000. WATS/800 Holding, Inc. essentially stepped into the shoes of WATS/800, Inc. for the remainder of the litigation. For the purposes of this opinion, the court will simply refer to the related

entities as "WATS". Damian Freeman remained in control of the litigation against ATN both before and after the WATS/800, Inc. bankruptcy.

**20.** Investment Partners estimated that the then present value of its security interest in the alleged collateral, WATS' customer list, was approximately $4.5 million.

**21.** ATN also granted WATS a security interest in all of its assets. (Defendants' Exh. No. 22).

against the Allens asserted in this adversary proceeding. In effect, WATS gave ATN credit for the value of the fraudulent transfers claims asserted against the Allens in this litigation.

As a part of this settlement, Carpenter relinquished control of ATN to Telecom Holdings, LLC and RBW Holding, LLC, entities owned and controlled by WATS' president, Damian Freeman. Freeman took control of the debtor and remains in control of ATN today as ATN's president.[22] At the time Freeman acquired the debtor, in October 2000, about 18 months after the settlement with the Allens, ATN was generating annual revenues of between $10 and $15 million.

At the time of the settlement between ATN and WATS, Carpenter gave Freeman an affidavit, dated October 19, 2000, indicating that he had a negative net worth of $9,471,781.00, largely attributable to the $8,976,460 obligation arising from the promissory notes he gave to ATN under the settlement with the Allens. (Plaintiff's Exh. No. 34). Carpenter gave this affidavit to Freeman in anticipation that ATN would forgive the $9—$10 million in shareholder loans Carpenter owed to ATN, which Freeman did on behalf of ATN.[23] In addition, Carpenter was promised a consulting contract with annual payments of $100,000 and ATN's agreement to pay his $25,000 monthly home mortgage payments. ATN paid Carpenter's home mortgage for some time, ultimately paying approximately $350,000.

## Chapter 11 Case

Freeman continued to operate ATN for almost 3 years after the WATS settlement. Eventually, he concluded that ATN needed to reorganize its business under the protection of Chapter 11 of the Bankruptcy Code. The petition initiating this case was filed on January 10, 2003. (Defendants' Exh. No. 2). The filing occurred more than four years after the handwritten settlement agreement was signed on December 23, 1998; however, if the statute of limitation ended on the date that the formal written Agreement was signed, January 12, 1999, the Chapter 11 filing was made just two days before the four-year period expired.

ATN timely filed its schedules, listing $805,191.89 in assets and total debts of $8,421,817.16, mostly amounts due to WATS and Investment Partners.[24] Specifically, WATS held a first position secured lien on all of ATN's assets for $4,766,978.03, and Investment Partners held a second priority secured position of $2,713,148.27. Subtracting these claims, on the date this Chapter 11 case was filed, ATN acknowledged non-insider secured claims of only $269,455.30 and non-insider unsecured claims of $672,235.56. Insiders held 89% of ATN's debt on the bankruptcy filing. Noninsiders held only a small portion, 11%.

---

22. The parties also executed a number of documents in connection with the WATS/ATN settlement, including: a Settlement and Release Agreement, a Stock Purchase Agreement and Agreement with Respect to Other Matters, and an Indemnity Agreement. (Defendants' Exh. Nos. 13, 14, and 16).

23. On October 23, 2000, Damian Freeman, now in control of ATN, did indeed forgive all debt owed by Carpenter to ATN in a Debt Cancellation and Release Agreement. (Defendants' Exh. No. 15).

24. ATN had managed to pay WATS and Investment Partners a total of $5.5 million on the judgment liability. These funds, close in amount to that received by the Allens, was paid by AT & T after resolving many disputes between AT & T and ATN. However, ATN certainly owed WATS and Investments Partners a large balance on their claims.

ATN eventually confirmed its Amended Plan of Reorganization (Defendants' Exh. No. 70) on June 22, 2004. (Defendants' Exh. No. 71). Pursuant to the confirmed plan, ATN continued its operations and retained control of its assets. A special master was appointed to investigate all transfers to certain insiders occurring within one year of the petition date.

Further, the reorganized debtor retained the ability to pursue the Allens in this adversary proceeding. The debtor asserts 13 counts in its Amended Complaint. The Allens have raised two affirmative defenses and a counterclaim. The legal issues are varied and somewhat complex. Ultimately, the court will find that the debtor has failed to establish a basis to undo ATN's settlement with the Allens. However, to reach this conclusion, the court now will analyze the various issues raised by the parties, starting with the Allens' affirmative defense that the claims are barred by the applicable New Jersey statute of limitations.

**Statute of Limitations Defense**

■ The Allens assert that the six fraudulent transfer claims as well as the count alleging improper distributions to shareholders, Counts 1–7, are barred by the applicable statute of limitations. Under New Jersey law, these avoidance claims must be filed within four years of the "date the transfer was made or the obligation incurred." N.J. STAT. ANN. § 25:2–31. Usually, the date of the transfer is the same as the date the obligation

was incurred. However, here, the Allens argue that ATN incurred the obligation to make the transfers long before the actual transfers were made and more than four years before this adversary proceeding was filed.

The issue is whether ATN incurred any obligation when the handwritten settlement agreement was signed on December 23, 1998. Pursuant to N.J. STAT. ANN. § 25:2–28(e)(2) "an obligation is incurred...if evidenced by a writing, when the writing executed by the obligor is delivered to or for the benefit of the obligee." If ATN indeed did incur an obligation under the handwritten settlement agreement in December 1998, the statute of limitations expired more than four years *prior* to the date ATN filed this Chapter 11 case, on January 10, 2003. However, if ATN did *not* incur any obligation under the handwritten settlement agreement, the relevant dates, for statute of limitation purposes, are either the date ATN signed the formal Agreement on January 12, 1999, or the dates ATN actually transferred funds to the Allens or their attorneys, all of which occurred well within the four years preceding the Chapter 11 filing.[25]

ATN argues that it cannot be bound by any agreement it did not sign. ATN relies on the statutory language that specifically provides that an obligation is incurred only when the obligor signs the written document; because ATN never signed the handwritten agreement, ATN did not incur

---

**25.** A chapter 7 trustee's avoidance action was not barred by the four-year statute of repose under New Jersey's UFTA where the four-year period had not lapsed prior to commencement of the debtor's case, and the trustee filed the adversary proceeding within two years of entry of order of relief. *In re Buildings by Jamie, Inc.*, 230 B.R. 36 (Bankr.D.N.J.1998). The same would be true of ATN's status as a debtor in possession following the filing of its

Chapter 11 case, pursuant to Section 1107(a) of the Bankruptcy Code. If the statute of repose had not expired prior to the filing of this Chapter 11 case, ATN had two years from the date of the petition, until January 10, 2005, to file this adversary proceeding. The adversary proceeding was filed on April 28, 2003. The only issue is whether the statute of limitations already had expired before this case was filed.

any obligations under that agreement. ATN further argues that the handwritten agreement imposed no obligation on ATN or required ATN to take any action.

On the latter point, the court holds that ATN *did* incur direct obligations under the handwritten agreement. For example, the agreement includes the following language: "$100 K from ATN to Flaster by 12/31/99." The only reasonable interpretation of this language is that ATN was obligated to transfer $100,000 to the Allens' attorneys no later than December 31, 1999.

The court, however, finds that ATN's actual obligations under the handwritten agreement were even broader. Many of the obligations imposed under the agreement do not identify which party, Carpenter or ATN, would make the actual payments of $1,350,000 to the Flaster firm and $6,250,000 to the Allens. After weighing all of the evidence and the credibility of the parties, the court concludes that *all* of the payment obligations imposed under the handwritten agreement rested initially with ATN and only secondarily with Carpenter. When the handwritten agreement was executed, all parties, including ATN, understood that ATN primarily was obligated to fund the payments required under the settlement agreement. Moreover, the scope and nature of the obligations imposed in the handwritten agreement did not vary substantively from those contained in the subsequent typed Agreement.

The court further finds that ATN voluntarily agreed to incur the obligations imposed under the handwritten agreement. The settlement was reached in the midst of a multi-week evidentiary trial. The two controlling shareholders, Carpenter and Daniel, had agreed on a settlement and for the first time in years were working in tandem. No other shareholders had any voting or decision making authority. The attorneys for both Daniel and Carpenter signed the agreement, as did the attorney for David Allen. These attorneys certainly had the power to obligate ATN under the agreement, irrespective of the fact that ATN's attorney did not directly participate in the negotiations or separately sign the handwritten agreement.

■ ATN now argues that it incurred no obligations under the December 1998 agreement because the company's attorney did not sign the document. ATN ignores the reality that Carpenter and Daniel were the only two shareholders with voting stock and that these gentlemen had the absolute ability to bind the company and to incur the obligations under the Agreement. Corporations, as legal entities, can only act through their agents, officers, directors, and shareholders. *O'Halloran v. First Union Nat. Bank of Fla.*, 350 F.3d 1197, 1205 (11th Cir.2003) (corporate entities must rely on officers and employees to perform corporate duties); *Genova v. Longs Peak Emergency Physicians, P.C.*, 72 P.3d 454, 462 (Colo.App.2003) ("As an inanimate entity, a corporation must act through agents."); *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *McCormick v. Cupp*, 106 S.W.3d 563, 570 (Mo.App.W.D.2003) ("Corporations are bound by contracts entered into by its agents that have apparent, actual, or inherent authority to contract on the corporation's behalf.").

Accordingly, consistent with Section 25:2–28(e)(2) of the New Jersey Statutes, the court holds that ATN incurred an obligation evidenced by the handwritten agreement executed by ATN and delivered to the Allens, the obligees, on December 23, 1998. As such, the four-year period in which ATN could raise the claims asserted in Counts 1–7 expired on or about December 23, 2002, several weeks prior to the

date ATN filed this Chapter 11 case, on January 10, 2003. The claims are barred.

## Failure to Sue Initial Transferee Defense

■ Next, the Allens argue that ATN failed to first sue the initial transferee, Carpenter, before asserting the claims against them contending that they are subsequent transferees. If, as the Allens contend, Carpenter borrowed the money from ATN to, in turn, make the transfers to the Allens and buy their stock, then Carpenter is the initial transferee. Until ATN first avoids this initial transfer, the Allens argue, pursuant to Section 550 of the Bankruptcy Code, ATN cannot pursue subsequent transferees.

Section 550(a) of the Bankruptcy Code provides that a trustee or debtor in possession may choose to recover property from an initial transferee of a fraudulent transfer, an immediate transferee, or any mediate transferee "to the extent that a transfer *is avoided* under section 544...of this title." (*emphasis added*). At least one bankruptcy court has interpreted this provision as requiring the actual avoidance of an initial transfer before recovery is sought from subsequent transferees. *In re Trans–End Technology, Inc., v. Latham & Watkins*, 230 B.R. 101 (Bankr.N.D.Ohio 1998). If this court concludes that the Allens indeed are subsequent transferees, then the court next must determine if ATN properly should have avoided the transfer from ATN to Carpenter before suing the Allens.

Factually, the court first finds that the Allens or their agents, the Flaster firm, were the *initial* transferees of the funds paid by ATN. The Allens directly received $6,263,015 from ATN, excluding the forgiveness of any shareholder loan in the approximate amount of $1.6 million owed by the Allens to ATN.[26] In addition, the Flaster firm received payments of $1,350,000 from ATN for reimbursement of fees and costs incurred on behalf of the Allens in the shareholder litigation.

The monies went directly from an account at ATN to the Allens or the Flaster firm. No monies ever passed through any account controlled by Carpenter. The subsequent decision by ATN to characterize the transfers as a loan to Carpenter was an afterthought to balance ATN's financial records. Although the receivable from Carpenter to ATN was legitimate and collectible, the later characterization in no way alters the reality that ATN directly made all of the distributions required under the Agreement either to the Allens or to the Flaster firm.

A case factually similar to this one is *In re Video Depot, Ltd.* (*Schafer v. Las Vegas Hilton Corp.*), 127 F.3d 1195, 1198 (9th Cir.1997). In that case, the principal of the debtor corporation directed the corporation to directly pay an individual creditor of the principal. The principal and the debtor corporation characterized the payment as a loan, just as ATN did here. The issue before the court was whether the creditor was the initial transferee or whether the principal of the corporation was the initial transferee. The court reasoned that, although the principal controlled the debtor corporation's operations and arranged for the check to be issued, the check was a direct transfer from the debtor corporation to the creditor. *Id.* at 1198. Simply characterizing the transfer

---

**26.** New Jersey law broadly defines "transfer" to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance." N.J.S. Section 25:2–22. As such, ATN's forgiveness of the Allens' shareholder loans also would qualify as a direct transfer from ATN to the Allens.

as a loan does not negate the facts of the underlying transfer—the funds went directly from the corporation to the creditor, not via the principal.

The language in the Agreement also supports the conclusion that all parties understood that ATN, not Carpenter, was to make the required payments. In at least 8 sections of the Agreement, it states that "ATN shall pay". (Plaintiff's Exh. No. 6, paragraphs 2.3.1.1; 2.3.1.2; 2.3.3; 2.7.1; 6.1; 6.2; 6.3; and 8.3). The Agreement does not say Carpenter shall borrow monies from ATN and *then* pay the Allens. Accordingly, the court finds that the Allens or their agents are the initial transferee.

■ However, even if Carpenter were deemed the initial transferee, the court finds the distinction between initial transferee and mediate transferee for avoidance purposes is irrelevant. Applicable case law and statutes do not require suit against the initial transferee before seeking to recover an avoidable transfer against subsequent transferees. Section 550 of the Bankruptcy Code provides that a plaintiff may recover a fraudulent transfer from the initial transferee or any immediate or mediate transferee. The provision contains no language that suggests that recovery from immediate transferees is in any way dependent upon a prior action or recovery against the initial transferee. *Kendall v. Sorani (In re Richmond Produce Company, Inc.)*, 195 B.R. 455, 463 (N.D.Cal.1996); *contra, In re Trans–End Tech.*, 230 B.R. 101, 104 (Bankr.N.D.Ohio 1998).

In the decision of *In re Richmond Produce Co.*, the District Court for the Northern District of California directly addressed the issue at bar when it affirmed the bankruptcy court's decision permitting the trustee to recover a fraudulent transfer from a mediate transferee, irrespective of whether the trustee had sued the initial transferee of the relevant property. Analyzing the language of Section 550, the court concluded that "once a trustee proves that a transfer is avoidable...he may seek to recover against any transferee, initial or immediate, or an entity for whose benefit the transfer is made." *Id.* at 463. The court found that an interpretation of Section 550 mandating actual avoidance of initial transfers, "conflates Chapter 11's avoidance and recovery sections." The court further explained that "[t]he 'to the extent that' language simply recognizes that transfers sometimes may be avoided only in part, and that only the avoided portion of a transfer is recoverable." *Id. (citing In re Sufolla, Inc.*, 2 F.3d 977, 982 (9th Cir.1993) *(quoting In re Deprizio*, 874 F.2d 1186, 1195–96 (7th Cir. 1989))). Moreover, the legislative history of Section 550 also explains the relevant language. The legislative history states that "to the extent" means that "liability is not imposed on a transferee to the extent that a transferee is protected under a provision...which grants a good faith transferee for value of the transfer that is avoided only as a fraudulent transfer, a lien on the property transferred to the extent of value given." 124 Cong. Rec. H. 11,097 (Sept. 28, 1978), S 17414 (Oct. 6, 1978).

This court adopts the analysis of the district court in *Richmond Produce*, and rejects the reasoning of the court in *Trans–End*. Nothing in the language of Section 550 requires a plaintiff in a fraudulent transfer adversary proceeding to avoid the transfer received by the initial transferee before continuing with avoidance actions down the line of transfers. Certainly, the plaintiff *can* pursue the initial transferee, but the plaintiff is not obligated to do so. The plaintiff is free to pursue any of the immediate or mediate

transferees, and nothing in the statute requires a different result.

Lastly, irrespective of Section 550 of the Bankruptcy Code, New Jersey law specifically allows a plaintiff to choose which transferee to pursue—the initial transferee or those later in line. New Jersey Statute 25:2–30 provides that a plaintiff may elect to recover a judgment for the value of the asset transferred or the amount necessary to satisfy the creditor's claim from either the first transferee or from any subsequent transferee, other than a good faith purchaser who took for value. Therefore, the applicable state statute contemplates allowing a plaintiff to choose whether to pursue the initial transferee, a penultimate transferee, or the final transferee. *Gibbons v. First Fidelity Bank, N.A. (In the Matter of Princeton–New York Investors, Inc.)*, 199 B.R. 285, 291 (Bankr.D.N.J. 1996). For all these reasons, the court rejects the Allens' argument that ATN's fraudulent transfer claims must fail because ATN did not first sue Carpenter.

### Constructive Fraud (Counts 1, 2, 5 and 6)

The most factually complicated counts asserted by ATN are the four counts asserting that ATN's transfers to the Allens were constructively fraudulent. The counts are divided between the constructive fraud statute relating to both present and future creditors (Counts 5 and 6), Section 25:2–25(b) of the New Jersey Statutes,[27] and constructive fraud counts relating to only present creditors (Counts 1 and 2) brought pursuant to N.J. STAT. ANN. § 25:2–27(b).[28] Based on the dichotomy in New Jersey law separating allegations of actual transfers from allegations relating to the date a debtor incurred an obligation, Counts 1 and 5 challenge actual transfers. Counts 2 and 6 challenge obligations incurred by ATN.

### Reasonably Equivalent Value

■ In order to succeed in avoiding the transfers to the Allens and their agents as constructively fraudulent under Section 25:2–25 of the New Jersey Statutes, the Allens must prove that ATN failed to receive "a reasonably equivalent value in exchange" for the transfers made by ATN or the obligations incurred by ATN. The concept of "reasonably equivalent value" does not require a dollar-for-dollar exchange. *In re Perry County Foods, Inc.*, 313 B.R. 875, 895 (Bankr. N.D.Ala.2004) (*citing Butler Aviation Intern'l, Inc. v. Whyte (Matter of Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1125–26 (5th Cir.1993) ("Although the minimum quantum necessary to constitute reasonably equivalent value is undecided, it is clear that the debtor need not collect a dollar-for-dollar equivalent to receive reasonably

---

27. Under this statute, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:....(b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: 1) was engaged or was about to engage in a business or transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or 2) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due."

28. Under this statute, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."

equivalent value."); *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir.1997) ("We have held that the formula for determining reasonably equivalent value is not a fixed mathematical formula....")). Rather, a factual investigation is needed to determine whether the value of what the transferor received was generally, not exactly, equivalent to the transfers made or the obligations incurred. *In re Viscount Air Services, Inc.*, 232 B.R. 416, 434 (Bankr.D.Ariz.1998) (comparing what the debtor surrendered with what the debtor received in return).

■ In situations involving transfers to insiders, the transfers are scrutinized more closely. For example, payments made by a debtor corporation on its shareholders' car and house loans generally are not considered "reasonably equivalent," even if the shareholders use their homes for business entertainment purposes, unless the corporation receives some type of benefit. *General Electric Capital Auto Lease, Inc. v. Broach (In re Lucas Dallas, Inc.)*, 185 B.R. 801 (9th Cir. BAP 1995). However, the benefit need not be direct. *General Electric Credit Corporation of Tennessee v. Murphy (In re Alberto Duque Rodriguez)*, 895 F.2d 725, 727 (11th Cir.1990); *In re Computer Universe Inc. (Hall v. Arthur Young and Company)*, 58 B.R. 28, 30–31 (Bankr.M.D.Fla.1986); *Beemer v. Walter E. Heller & Co. (In re Holly Hill Medical Center, Inc.)*, 44 B.R. 253, 255 (Bankr.M.D.Fla.1984); *Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979 (2nd Cir.1981) ("[A] debtor may sometimes receive 'fair' consideration even though the consideration given for his property or obligation goes initially to a third party.").

A good example of a debtor receiving both direct and indirect benefits that constitute reasonably equivalent value is demonstrated in a factually similar case, *Schaps v. Just Enough Corporation (In re Pinto Trucking Service, Inc.)*, 93 B.R. 379 (Bankr.E.D.Pa.1988). In that case, shareholders were fighting for control of the company, Just Enough Corporation ("Just Enough"). After months of hostile litigation, the parties settled their disputes at a negotiating session. Just Enough was required to transfer real estate, valued at $250,000, and cash from the company's profit sharing plan of an additional $250,000, and to forgive shareholder loans totaling over $600,000. In exchange, the company received the stock held by the litigious shareholders. The agreed settlement was in many ways similar to the settlement reached by the Allens with ATN.

About one year later, Just Enough filed a case under Chapter 11 of the Bankruptcy Code. The case was unsuccessful and was converted to a Chapter 7 liquidation case. A trustee was appointed. The trustee, in turn, filed a fraudulent transfer adversary proceeding against the former insiders. In ruling that the company had received reasonably equivalent value in the exchange of transfers made under the settlement, the court held that a compromise, alone, can supply the element of consideration needed to support a contract. To wit:

> While it is true that a totally groundless claim of a non-dispute may not constitute consideration...the courts will not look at the underlying merits of a compromise very critically to determine its worth. The sufficiency of the consideration for a compromise is not to be determined by the soundness of the original claim of either party. The very object of compromise is to avoid the risk or trouble of that question.

*Pinto Trucking*, 93 B.R. at 389 (*citations and quotations omitted*). After thoroughly reviewing the compromise of the share-

holder litigation and finding that the settlement was negotiated at arms-length, the court concluded that reasonable value was given in exchange for the transfers from the corporation to the insiders.

ATN here argues the opposite—that ATN received absolutely nothing in return for the millions of dollars paid by ATN under the Agreement. They argue ATN could not have received reasonably equivalent value because ATN transferred the payments to the Allens or their agents, and Carpenter, not the company, got the Allens' shares in ATN. The court does not agree.

ATN fails to acknowledge that the company was a named defendant in the shareholder litigation. ATN's presence as a defendant was more than as a nominal party—ATN was directly liable on several of the Allens' claims. For example, the company in the Agreement acknowledged its obligation to indemnify the Allens for the legal fees and costs they incurred. These fees and costs totaled $1,350,000. ATN owed the same duty of indemnification to Carpenter, who received reimbursement from ATN for significant legal fees and costs.[29] Settlement of the lawsuit stopped the tab on future legal bills due to ATN's shareholders and eliminated the need for ATN to incur additional legal fees on its own.

ATN then argues that, because the litigation settled in the midst of trial, any further legal fees would have been *de minimus* and that no court would have awarded any actual damages against ATN. Neither this court nor ATN has access to such a crystal ball. The court cannot predict how much longer the trial would have lasted or the ultimate outcome of the trial. ATN without question faced substantial

potential liability. In addition, even if the Allens lost, after complex litigation such as that involved in the shareholder suit, an appeal was almost guaranteed. The appeal would have been complex and fraught with uncertainty. Certainly, ATN would incur significant additional attorney fees. By settling the claim, ATN got a quantifiable and, more importantly, a final resolution. Continuation of the litigation brought uncertainty, the possibility of an unfavorable judgment against ATN, and a guarantee of substantial attorney fees.

In addition, ATN fails to recognize that, although Carpenter ended up with ownership of all of ATN's voting stock, the company received two promissory notes from Carpenter totaling $6,250,000. As the court found earlier, these notes were not just illusory pieces of paper; the notes were enforceable by ATN, and Carpenter considered his financial obligation real. Carpenter also assumed the Allens' shareholder debt exceeding $1.6 million. Indeed, Carpenter's shareholder liability exceeding $9 million and primarily arising from the litigation with the Allens was a significant reason he later decided to settle the litigation with Freeman on the WATS claims. Carpenter perceived the liability as imposing a significant legal burden on him.

Lastly, the court would find that the settlement was negotiated on an arms-length basis between the parties. ATN received substantial value simply because its two primary shareholders were no longer fighting. The resolution of the insider dispute resulted in Carpenter returning his focus exclusively to ATN's operations and profitability. Although this last factor is more difficult to quantify, the company's

---

**29.** Carpenter testified that ATN paid his fees and costs; however, he did not provide an exact figure of the amounts paid.

future depended on a resolution of the litigation. In the end, the court concludes that ATN received sufficient reasonably equivalent benefits, both direct and indirect, in exchange for the transfers made by ATN. ATN has failed to prove that the transfers in question were constructively fraudulent under N.J. STAT. ANN. § 25:2–25. Therefore, Counts 5 and 6 fail.

### Insolvency

As to Counts 1 and 2, in order to succeed in avoiding the transfers to the Allens and their agents as constructively fraudulent under Section 25:2–27 of the New Jersey Statutes, the Allens must prove that ATN was insolvent at the time the obligations were incurred or the transfers made. The relevant time spans the period from December 23, 1998, through June 1, 1999.

Under New Jersey law, a debtor is insolvent if "the sum of the debtor's debts is greater than all of the assets, at fair valuation." N.J. STAT. ANN. § 25:2–23(a). By way of comparison, the New Jersey definition is functionally similar to the definition of insolvency contained in Section 101(32) of the Bankruptcy Code that similarly requires assets to be valued at "fair value" for "balance sheet" insolvency purposes.

The New Jersey statute further provides plaintiffs seeking to avoid a fraudulent transfer with a rebuttable presumption—a presumption of "equity insolvency"—that a debtor is insolvent if the debtor "is generally not paying his debts as they become due." N.J. STAT. ANN. § 25:2–23(b). Under an equity insolvency analysis, ATN arguably was not paying its debts as they became due during the six months be-

tween the date the handwritten agreement was signed, December 23, 1998, and the date of the major transfers to the Allens, June 1, 1999. As such, under New Jersey law, ATN is presumptively insolvent during this approximately five month time period.

The Allens argue, however, that, after the transfers, ATN resumed normal operations and its history of paying its bills on a timely basis. They contend that, even if ATN did go through a short period in which the company was not paying its bills timely, the presumption of equity insolvency is rebutted using a balance sheet insolvency analysis. As a starting point, all parties rely on the company's audited financial statements prepared by Alloy, Silverstein, Shapiro, Adams, Mulford, & Co. (Defendants' Exh. No. 73). On December 31, 1999, the auditors gave ATN a "clean" report.[30] Even ATN's expert opined that the audited financial statements were accurate. The statements reflect that ATN had a slight negative net worth, or, stated differently, that its liabilities exceeded its assets by $216,144.

Next, all parties agree that certain adjustments are needed to these audited financial statements to reach a fair valuation of the debtor's assets and liabilities. The Allens argue that after these adjustments are properly made, ATN was solvent. ATN disagrees, and argues that after the necessary adjustments are made, ATN was grossly insolvent.

■ All parties agree that one particular adjustment is merited. An upward adjustment is needed to fairly value the

---

**30.** The auditors opined that the financial statements fairly presented, "in all material respects, the combined financial position of Advanced Telecommunication Network, Inc. and Affiliated Companies as of December 31, 1998 and 1997, and the results of their operations and their cash flows for the years then ended in conformity with generally accepted accounting principles." (Defendants' Exh. No. 73, ATN329).

debtor's customer base.[31] Mr. Cuthill, ATN's expert,[32] argues an upward adjustment of between $4,655,000 and $7,430,000 is merited.[33] (Plaintiff's Exh. No. 41). The Allens' expert, Soneet Kapila, argues that a higher adjustment, to $10,827,967, is appropriate.[34] (Defendants' Exh. No. 17). In any event, both parties agree that, when the customer base is fairly valued and before any other adjustments are made, ATN was solvent during the relevant period of time, pursuant to its audited financial statements on December 31, 1998.[35]

However, the parties disagree on whether two additional substantial *downward* adjustments exceeding $15 million are needed, which, if made, demonstrate that ATN was insolvent during the relevant time period. First, Cuthill asserts that loans payable by shareholders should be valued at zero, not as a $4,520,902 receivable. Second, he asserts that ATN undervalued its contingent liabilities by $10,500,000 by failing to include any liability attributable to the WATS litigation. The court finds that neither downward adjustment is merited.

■ As to the issue relating to the shareholder loans, Cuthill argues that ATN overvalued its outstanding and substantial shareholder loans, particularly as

**31.** Courts making an insolvency adjustment are not bound by generally accepted accounting principles. *In re Sierra Steel, Inc., v. Totten Tubes, Inc.,* 96 B.R. 275, 278 (9th Cir. BAP 1989); *MGR Distribution Corp. v. CIT Group/Commercial Services, Inc. (In re Merry-Go-Round Enterprises, Inc.),* 229 B.R. 337, 342–343 (Bankr.D.Md.1999); *In re Babcock & Wilcox Co.,* 274 B.R. 230 (Bankr.E.D.La.2002).

**32.** Cuthill and his firm, Quantum Consulting Group, LLC, were retained to render an opinion as to whether ATN was insolvent on December 31, 1999, and for the six months following thereafter. In his report, dated August 20, 2003, Cuthill concluded that ATN's debts exceeded its property at a fair valuation as of December 31, 1998, and during the six month period ended June 30, 1999. Additionally, Cuthill opined that ATN was not paying its debts as they became due during this period. (Plaintiff's Exh. No. 41).

**33.** ATN generally acquires its customers by purchasing accounts from third parties. Upon purchasing a block of accounts, the debtor typically listed the full purchase price on its balance sheet and then amortized the value over its expected economic life. However, this process does not represent a fair valuation of the accounts purchased by ATN because ATN often kept their customers long after the amortization period. To evaluate the fair value of ATN's customer base, ATN retained Vince Shea of Sheldrick, McGehee &

Kohler, Inc. After conducting their valuation, Sheldrick, McGehee & Kohler concluded that the value was determined to range between $7,430,921, as of January 12, 1999, and $4,653,778, as of June 1, 1999 (Plaintiffs Exh. No. 42). Cuthill picked a mid-point and used an increased value of $5.2 million for ATN's customer base.

**34.** The Allens' expert, Kapila, argued that a substantially higher value should be attributed to ATN's customer base. (Defendants' Exh. No. 17). The difference in values between that used by Shea and Kapila is that Kapila used an unjustified multiplier in making his calculations. Kapila has no expertise in rendering such a valuation opinion or any expertise in the unique financial aspects of customer values in the telecommunication industry. As such, the court rejects Kapila's opinion on the value of ATN's customer base during the relevant period of time.

**35.** Cuthill also argues that the value of ATN's intangibles are overstated by $70,000 to $94,000, which was the amount reflected on the debtor's financial records for the value of the debtor's customer base. Both parties agree that the debtor's book amount is too low and should be adjusted upward to an amount equal to or greater than $5.2 million. Subtracting the *de minimus* book value does not affect the parties' position on solvency. ATN was either grossly insolvent or substantially solvent. A $94,000 swing is immaterial in the analysis.

to Carpenter. As of December 31, 1998, the outstanding balance of these loans totaled approximately $4.5 million and, by June 30, 1999, had increased to approximately $10.7 million, largely due to the promissory notes Carpenter gave to ATN for the payment to the Allens under the Agreement.[36] Cuthill asserts ATN should have eliminated this asset *in toto* based almost exclusively on one telephone conversation he had with Carpenter that lasted about 30 minutes.

After this one telephone call, Cuthill concluded that neither Carpenter nor his father, Robert Carpenter, could have repaid the shareholder loans due to ATN during the relevant period. Mr. Cuthill reached the same conclusion as to Daniel Allen on even less information—a statement Daniel made in 1996, two years before the relevant period, that stated his income from ATN was his sole source of income and, again, the statement of Carpenter that he did not think Daniel had the financial means to repay the shareholder loans.

Any expert opining on the collectibility of a receivable, due from an insider or not, requires some type of investigation into the obligor's financial situation. For example, credit reports or financial statements could serve as minimal due diligence. Certainly, an expert must do more than ask the obligor if he could or could not pay the debt. Here, as to Daniel, Cuthill did not even do this. Casual telephone conversations occurring years after the fact and statements made years prior to the relevant period simply do not support such a drastic adjustment of over $4 million to ATN's balance sheet. Cuthill

has failed to establish any factual basis for such a substantial downward adjustment.

Nor does the adjustment seem logical or appropriate. As discussed earlier, the vast majority of the net worth of both Daniel and Carpenter was encompassed in the value of ATN. Both gentlemen could have had difficulty repaying their shareholder loans without relying on the value of their ATN stock. However, if the value of ATN stabilized or improved, then the value of their ATN stock correspondingly stabilized or rose. In that event, both gentlemen could then capitalize on this value to repay their loans. Indeed, the Allens received over $6 million to compensate them for the value of their interest in ATN. Therefore, although neither Daniel nor Carpenter had liquid assets, they both had a valuable interest in ATN that, if needed, could be liquidated to pay the shareholder loans. This value is the precise point of the litigation between the two shareholders.

Before the settlement, the two shareholders had equal voting interests in ATN. After the litigation settled and the distributions were made, Carpenter had 100% interest in ATN, and Daniel and his brother received over $6 million. Cuthill ignores the obvious value of ATN stock in concluding that all of the shareholder loans payable to ATN were worthless. Cuthill's position is irreconcilably circular—ATN is insolvent because Carpenter cannot repay his shareholder loans, and Carpenter cannot repay his shareholder loans because ATN is insolvent. The court finds that no downward adjustment attributable to the collectibility of ATN's shareholder loans is merited. Therefore, ATN was solvent during the relevant time by between $4

---

**36.** The shareholder loan receivable fluctuated during the relevant period as follows: $4,520,902 on December 31, 1998; $4,057,759 on January 31, 1999; $3,996,567 on May 31, 1999; and $10,316,784 as of June 30, 1999, after the settlement payments were made to the Allens and Carpenter signed the two new promissory notes totaling $6,250,000.

million and $7 million,[37] unless a downward adjustment of $10.5 million is merited to reflect the alleged contingent liability arising out of the WATS litigation.

■■■■■ In making a determination as to solvency, both contingent liabilities and contingent assets are appropriately considered. *Covey v. Commercial National Bank of Peoria*, 960 F.2d 657 (7th Cir. 1992); *Nordberg v. Arab Banking Corp.* (*In re Chase & Sanborn Corporation*), 904 F.2d 588 (11th Cir.1990); *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir.1988). However, by definition, a contingent liability is contingent—the obligor may or may not have to pay a liability in some as yet undetermined amount. As the Seventh Circuit Court of Appeals held in *Xonics:*

> [A] contingent liability is not certain—and often is highly unlikely—ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability will become real.

*Xonics*, 841 F.2d at 200. Therefore, contingent liabilities are not valued at their potential face amount; rather "it is necessary to discount it by the probability the contingency will occur and the liability become real." *In re Chase and Sanborn*, 904 F.2d at 594 (*citing Xonics*, 841 F.2d at 200). Further, the contingency must be capable of reasonable estimation. *Xonics*, 841 F.2d at 200. "The asset or liability must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities." *Id.* (*citations omitted*).

■■■■ Therefore, to justify a retroactive downward adjustment of $10.5 million attributable to an alleged contingent liability arising from the litigation between WATS and ATN, Cuthill must demonstrate that, between December 1998 and June 1, 1999, it was probable that ATN would incur actual liability to WATS to some degree and that the amount of this liability was capable of reasonable estimation. *MGR Distribution Corp. v. CIT Group/Commercial Services, Inc.* (*In re Merry–Go–Round Enterprises, Inc.*), 229 B.R. 337, 342 (Bankr.D.Md.1999) (explaining that contingent liabilities should be discounted for the probability that the contingency will occur and that the post-discounting valuation is made from the debtor's perspective).

The ATN/WATS litigation was filed in 1995. In late 1998 and early 1999, when the Allens settled the shareholder litigation, the effect of the WATS litigation on ATN's operations was unclear. The company's assets were not clearly impaired, and no one could have reasonably estimated the amount of the loss at that time. In letters to ATN's auditors prepared by ATN's lawyers, who were most knowledgeable about the claims raised in the WATS litigation, the lawyers did not mention the possibility that ATN could lose or face any substantial loss at all.

On October 19, 2000, about 18 months after the settlement of the shareholder litigation, the parties ultimately settled the WATS lawsuit. A consent judgment was entered against ATN for $10.5 million. ATN also forgave shareholder debt of $10.5 million, and its then sole shareholder of voting stock, Carpenter, walked away from the company, voluntarily turning over his equity interest to Freeman, president

---

**37.** The Allens' expert opined that ATN's assets exceeded its liabilities by $15,718,096 on December 31, 1998. Although a portion of this value is attributable to an inflated amount for the value of ATN's customer base, Kapila's opinion is that ATN was substantially solvent by over $10 million, after deducting the inflated asset value.

of WATS and the current president of ATN. Even the parties directly involved in the WATS settlement could not articulate how the settlement figures were calculated, other than that Investment Partners received the rough equivalent of its asserted security interest. If the direct players could not provide a logical basis for the settlement amount at the time, certainly no one could have reasonably estimated the amount of the settlement 18 months earlier.

To retroactively add a previously omitted contingent liability to a company's balance sheet for insolvency purposes, one must, in effect, return in time to evaluate what the company would have known at that time. Using information the company then had available, the evaluator must assess the probability that the contingent liability would become real and then evaluate if the amount of the liability is capable of reasonable determination.

Cuthill did not perform this type of analysis. He looked at a sampling of the pleadings filed in the WATS case. He talked to Carpenter and Freeman, but he did not interview the lawyers involved in the case at the time or do any sort of credible investigation into whether, in early 1999, ATN reasonably could have concluded its liability to WATS was real and that the amount of the liability was $10.5 million. The court concludes that, with the benefit of hindsight, Cuthill simply plugged the final settlement amount, $10.5 million, into the debtor's financial statements prepared months earlier—something which neither ATN's lawyers nor its auditors felt appropriate to do at the time.

Further, the court finds it very unlikely that, if Cuthill *had* performed the requisite analysis, he would have concluded that ATN would have or could have anticipated the *exact* amount of the final settlement. Perhaps, upon a thorough review, ATN, in 1999, should have anticipated a contingent liability to ATN in some amount, but exactly $10.5 million seems far fetched. The litigation was in the discovery stage. Trial preparation had not even started. ATN had just succeeded in dismissing a number of WATS counts and had only the remaining fraud counts left to address. Absent blind luck, no one could have predicted this result with any reasonable certainty, and Cuthill could only in hindsight. Accordingly, the court concludes that no downward adjustment to add a $10.5 million contingent liability payable to WATS is merited.

Without the downward adjustments asserted by Cuthill, ATN was solvent by a range varying between $4 million and $7 million during the entire period between December 31, 1998, and June 30, 1999. Therefore, ATN has failed to prove an essential element required to avoid a constructively fraudulent transfer as asserted in Counts 1 and 2. The court holds that the transfers at issue are not subject to avoidance under any theory of constructive fraud.

### Actual Fraud (Counts 3 and 4)

█ In Counts 3 and 4, ATN asserts that the various transfers made or obligations incurred by ATN under the shareholder settlement are subject to avoidance because ATN made the transfers with the actual intent to hinder, delay or defraud creditors of ATN. N.J. STAT. ANN. § 25:2–25(a). The purpose of the New Jersey Uniform Transfer Act is to prevent a debtor from placing assets beyond a creditor's reach with the intent to defraud, hinder or delay a creditor's collection efforts. *Gilchinsky v. National Westminster Bank, N.J.,* 159 N.J. 463, 732 A.2d 482, 488–489 (1999). The debtor bears the burden of demonstrating by clear and convincing evidence that ATN made the various trans-

fers at issue with the actual intent to delay, defraud, or hinder its creditors.

Because actual fraud is difficult to prove by direct evidence, most courts rely on the various "badges of fraud" to determine if circumstantial evidence demonstrates the requisite level of actual fraud by the debtor/transferor. N.J. STAT. ANN. § 25:2–26; *Gilchinsky*, 732 A.2d at 489; *Firmani v. Firmani*, 332 N.J.Super. 118, 752 A.2d 854, 858 (2000) New Jersey law includes the following factors among those that may be considered as a badge of fraud:

- The transfer or obligation was to an insider;
- The debtor retained possession or control of the property transferred after the transfer;
- The transfer or obligation was disclosed or concealed;
- Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
- The transfer was of substantially all the debtor's assets;
- The debtor absconded;
- The debtor removed or concealed assets;
- The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
- The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
- The transfer occurred shortly before or shortly after a substantial debt was incurred; and
- The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

N.J. STAT. ANN. § 25:2–26. In determining actual intent to defraud, courts must balance these factors as well as any other relevant factors. No single factor necessarily establishes actual fraud but, if a party demonstrates that a significant number of the badges are present, courts generally conclude that the transfers were made with actual fraudulent intent.

Most of these factors are not present here. For example, ATN did not abscond. Nor did ATN remove or conceal assets. Relying on Section 13.13 of the Agreement that imposed a confidentiality requirement on the parties, ATN argues that the transfers were concealed. In reality, the exact opposite is true. Virtually every employee connected with ATN's financial situation knew about the settlement and its details. They were working to gather cash needed to make the payments. The various employee e-mails reflecting ATN's cash position support a conclusion that the settlement was not kept confidential. Although ATN did not broadcast the settlement to its creditors or the public, there was no attempt to keep the settlement secret. As Carpenter testified, no one ever concealed the transfers or the terms of the Agreement. The confidentiality provision in the Agreement alone is not reason to find any active concealment by the parties. Here, the parties openly discussed the precise terms of the settlement with various people *not* involved in the settlement. No one involved in the settlement concealed its terms or absconded with ATN's assets.

Further, as discussed earlier in the section addressing ATN's constructive fraud counts, ATN was not insolvent at the time the transfers were made. Equally important, the value of consideration received by ATN was reasonably, if not exactly, equiv-

alent to the value of the property transferred, also as discussed above.

However, some of the factors indicating actual fraud arguably are present and even one sole badge of fraud can support a finding of actual fraud. *Firmani*, 752 A.2d at 858. The Allens unquestionably were insiders of the debtor and the recipient of the transfers. David was a shareholder. Daniel was an officer, a director, and owned an equal amount of stock as that owned by Carpenter.

Neither of the Allens, however, controlled ATN at the time ATN decided to enter into the Agreement or acted as insiders. David, an owner of a small amount of ATN's non-voting stock and a former employee, never played any controlling or managerial role at ATN. Daniel previously had actively run ATN. However, he had been prevented from participating in ATN's operations or decision making from April 1996 through the settlement in December 1998. Indeed, it was Carpenter's actions in locking Daniel out of the business that led to the lawsuit between the parties in the first place. The fact that Daniel also technically remained a director or officer of ATN after his termination as an employee and up to the time of settlement also did not magically bestow upon him any real control of ATN's operations. Indeed, the entire point of the shareholder lawsuit was to determine which of the voting shareholders would retain or regain control of ATN. Therefore, although the Allens held equity interests in ATN at the time of the settlement, for all practical purposes they were not insiders in control of the debtor. They had no means to force ATN to take any action, fraudulent or not.

Rather, ATN, the Allens, and Carpenter settled a legitimate controversy between the shareholders. Carpenter opined in his deposition that the price paid to ATN for the stock was reasonably equivalent to the value of the stock, "everything considered." (Defendants' Exh. No. 79, Deposition of Gary Carpenter, September 16, 2004, pps. 55–56). In the process, the Allens released any claim that either had against ATN. ATN funded the settlement and in exchange received two promissory notes executed by Carpenter, who would remain the sole shareholder of the ongoing company, valued at several million dollars. Therefore, although the transfers were made after the institution of litigation, the transfers were made to resolve legitimate litigation, not to avoid payment of a just debt, as is often the case with fraudulent transfers, or to hide assets from creditors. In a typical fraudulent transfer, the debtor seeks to transfer its assets in order to avoid paying a legitimate debt. Here, the opposite is true. ATN was trying to settle a dispute in order to get back to its normal operations and resume payment of its legitimate debts.

The only possible badge of fraud that actually supports ATN's allegation of actual fraud is that ATN transferred all of its available cash to the Allens in order to make all the payments required under the Agreement. ATN certainly did use all available cash, including certain pre-paid deposits. However, it retained its business, its customer list, its employees, and other assets. The company also regained its hope that its business would improve and prosper. Resolution of the shareholder suit allowed ATN to continue its operations for years after the transfers.

The court concludes that ATN, the Allens and Carpenter all entered into the Agreement in an honest attempt to settle their disputes. The Allens were not willing to cede control of ATN to Carpenter without a significant payment for their equity interest. Carpenter agreed to the settlement genuinely believing that, with the resolution of the shareholder litigation,

he could focus his attention on running the company and restore it to financial health. Carpenter acknowledged that the future success of ATN was not guaranteed and would be difficult, but it could be done.

Moreover, the fact that Carpenter also may have personally benefited does not demonstrate fraud. In every settlement, one must assume the parties settling the dispute believe that the agreement will benefit them personally. Acting in pursuit of personal self interest is not fraud. In summary, the court holds that none of the parties to the Agreement had the actual intent to hinder, delay, or defraud creditors, either present or future, of ATN when they entered into the Agreement or when the transfers occurred. ATN has failed to meet its burden. Counts 3 and 4 fail.

### ATN's Other Claims

### Limitations on Distributions to Shareholders (Count 7)

█ In Count 7, ATN asserts that the transfers to the Allens as shareholders were not allowed under Section 14A:7–14.1 of the New Jersey Statutes. This statute, titled "Limitations on Distributions to Shareholders" prescribes limits on corporations making distributions, either direct or indirect, to shareholders "in respect of any of its shares." N.J. STAT. ANN. § 14A:7–14.1(1). Essentially, such distributions are prohibited if the company is insolvent under either a balance sheet or equity insolvency analysis.

Cases decided under this statute recognize that directors of a corporation retain the sound discretion to declare dividends, unless a disgruntled shareholder seeking a dividend can establish some actionable abuse of discretion. *Semler v. Corestates Bank*, 301 N.J.Super. 164, 693 A.2d 1198, 1204–05 (1997) (Corporation cannot make distribution to shareholders if it will render it unable to pay its debts.); *Agnew v. American Ice Co.*, 2 N.J. 291, 66 A.2d 330, 333–34 (1949) (Unless controlled by statute, exercise of power to declare dividends rests in sound discretion of directors, and judicial interference with judgment of the corporate management is not justified absent an abuse of discretion.); *Blanchard v. Prudential Ins. Co. of America*, 78 N.J.Eq. 471, 481, 79 A. 533, *modified* 80 N.J.Eq. 209, 83 A. 220 (1912) (Equity can compel a corporation to declare dividends where there is a sufficient surplus above the necessities of the corporate business, and dividends cannot be withheld fraudulently, arbitrarily, or unreasonably).

However, this court could find no case decided under the statute that has *avoided* a transfer already made by a corporation to a shareholder, even if the distribution was improper. The statute appears to provide instructions to directors on when they can and cannot issue dividends or repurchase stock, and also to give shareholders some limited rights to force the declaration of dividends. The statute does not appear to grant any affirmative remedy to recover alleged improper distributions.

For example, the Third Circuit Court of Appeals in *Halper v. Halper*, 164 F.3d 830, 839–40 (3rd Cir.1999), wrestled with many complex jurisdictional and parol evidence issues as well as one question relevant to this case. The Circuit Court had to decide whether an employment signing bonus constituted an improper stock redemption under Section 14A:7–14.1 of the New Jersey Statutes. In holding that no improper stock redemption was intended or occurred, the Court did reference, albeit in *dicta*, that if the distribution had been found improper, a separate action for a fraudulent transfer was necessary to actually avoid the transfer. *Halper*, 164 F.3d at 840.

Based upon this apparent lack of prior court decisions and the limited guidance of *Halper*, this court concludes that the appropriate statute to avoid an improper transfer to a shareholder is Section 25:2–27 of the New Jersey Statutes, which the court previously addressed in ruling on Counts 1 and 2 above. ATN has not proven the necessary element of insolvency. As discussed at length above, ATN was not insolvent at the time the transfers were made to the Allens. Nor, the court finds, did the Allens have reasonable cause to believe that the debtor was insolvent at the time.

■ Further, even if Section 14A:–7–14.1 of the New Jersey Statutes *does* create some type of remedy to avoid improper distributions long ago made to shareholders, ATN's Count 7 fails for similar reasons. In New Jersey, a corporation may not make a distribution to a shareholder if, after giving effect thereto, the corporation would be unable to pay its debts as they became due in the usual course of its business or if the corporation's total assets would be less than its total liabilities. If the transfer is made more than 120 days after its authorization, as is largely the case here,[38] then the effect of the distribution shall be measured as of the date of payment. N.J. STAT. ANN. § 14A:7–14.1(2).

Under the Agreement, the Allens, both shareholders, clearly received substantial distributions from ATN in return for their shares. The payments were in excess of $6,250,000 and their attorneys received an additional $1,350,000.[39] The Allens got money from ATN in exchange for their stock.[40] Such distributions are appropriate, however, unless ATN can demonstrate that it was insolvent under a balance sheet test of insolvency or could not pay its bills as they became due *after* the transfers were made. ATN has failed on this point, as discussed at length above. Although ATN certainly was delaying payments to creditors prior to making the challenged payment, ATN was not insolvent under a balance sheet analysis at any point during the relevant period.

### Breach of Fiduciary Duty (Count 8)

Having found that ATN has failed to establish any basis to avoid the transfers made to the Allens under the Agreement, the court summarily will address each of the ancillary counts raised by ATN which seek money judgments against the Allens. In Count 8, ATN asserts that Daniel Allen breached his fiduciary duty in consenting to the Agreement and by accepting payment of the amounts required by the Agreement. ATN also argues that David

38. ATN's obligations to the Allens arose either on December 23, 1998, or January 12, 1999. Although one of the transfers for $250,000 to the Allens was made shortly after these dates, the larger transfer of $6 million did not occur until June 1, 1999, more than 120 days after the Agreement was executed.

39. The various payments to the Flaster firm, totaling $1,350,000, were made pursuant to ATN's obligation to indemnify Daniel under the company's Bylaws, not in respect to any of ATN's shares. Therefore, these transfers do not fall within the ambit of the statute.

40. The Allens argue that ATN did not purchase their stock from them, rather, Carpenter did. Therefore, they argue the payments they received under the Agreement were not made in respect of ATN's shares. First, as the court discussed earlier, the transfers went directly from ATN to the Allens in exchange for the Allens' transfer of their shares. Although Carpenter later executed a promissory note to ATN in exchange for obtaining the Allens' shares, the initial transfer was a direct one between ATN and the Allens. Further, the statute encompasses both direct and *indirect* transfers. To the extent one argues that ATN first transferred the monies to Carpenter before he purchased the Allens' stock, the statute would include this type of indirect transfer also.

Allen is separately liable because he aided and abetted his brother in this fiduciary breach.

■ As to David, no party has cited any statute or a single decision of any court that establishes any liability for aiding or abetting someone else in a breach of fiduciary duty. The court also could not locate any such decision. Therefore, the court concludes no such extenuated claim or liability exists. Count 8 fails as to David Allen.

■ As to Daniel, ATN asserts that he, as a director, owed ATN a fiduciary duty of loyalty, good faith, and due care, and that he breached these duties by consenting to and negotiating the Agreement. Under New Jersey law, a director owes the corporation and its shareholders a duty of loyalty, good faith, and due care. *Eliasberg v. Standard Oil Co. of N.J.*, 23 N.J.Super. 431, 441, 92 A.2d 862 (Ch.Div. N.J.1952). A director is not absolutely precluded from contracting with his company; however, any such agreements are subject to close scrutiny and must be made in good faith. *Hill Dredging Corp. v. Risley*, 18 N.J. 501, 114 A.2d 697 (N.J.1955). Moreover, the director is not entitled to the presumption of the reasonable judgment rule. Rather, the director bears the affirmative burden of demonstrating by clear and convincing evidence that the transaction was made in good faith and was fair and reasonable to the corporation. *In re PSE & G Shareholder Litigation*, 173 N.J. 258, 276–277, 801 A.2d 295 (2002); *Abeles v. Adams Engineering Co.*, 35 N.J. 411, 428, 173 A.2d 246 (1961). The object of this rule against improper corporate self dealing is to prevent directors from secretly using their fiduciary position to their own advantage and to the detriment of the corporation and of the other shareholders. *Hill Dredging*, 114 A.2d at 712.

■ ATN repeatedly argues that Daniel "forced" ATN to sign the Agreement to his own advantage and to ATN's detriment. This is not the case. ATN faced an uncertain future with the shareholder litigation hanging above it like a sword of Damocles, and certainly would have collapsed if this litigation was not resolved. Clearly, ATN and Carpenter would have benefited if less monies had been paid to the Allens under the Agreement. However, the opposite is equally true. ATN could have faced additional and substantial exposure over that paid under the Agreement if the case had proceeded to judgment. The reason that the law (and by extension, directors) prefer settlements over litigation is that the parties get a certain and predictable result. Here, the parties litigated for years and finally, during the trial, agreed to settle the fight rather than risk an uncertain verdict. Daniel did not force ATN to accept this settlement. He worked with Carpenter and ATN's attorneys to structure something that potentially offered future financial health to ATN and guaranteed the end of the shareholder dispute. Although ATN did not rebound as expected, the future of ATN was bleaker without the settlement than with the settlement. Therefore, the court simply cannot conclude that the Agreement was not a fair compromise for ATN at the time.

Certainly, the Allens also benefited, but that alone is not actionable. The Allens did not force ATN to accept the settlement; rather, the settlement independently made sense for ATN and all of the parties. Nor are the Allens responsible for ATN's later financial collapse, which perhaps is partially attributable to ATN's later settlement in the WATS litigation but probably more likely attributable to changing business conditions, the change in management, and the highly competitive nature of ATN's business. Daniel Allen

did not breach his fiduciary duty or engage in any actionable conflict of interest. He acted in good faith to resolve a legitimate dispute.

■ Moreover, the Agreement contains a broad release that prevents ATN from even asserting this claim for breach of fiduciary duty against the Allens.

(ATN's Exh. No. 6, paragraphs 9.1 and 9.2). Therefore, ATN released any claim for breach of fiduciary duty or otherwise that it held against the Allens years ago. Having now held that neither the Agreement nor the transfers are subject to avoidance, revision, or rescission, the clear and unambiguous terms of the release are fully enforceable as a separate contractual obligation of ATN. *Scott v. Mayflower Home Imp. Corp.*, 363 N.J.Super. 145, 831 A.2d 564 (2001). For this additional reason, Count 8 fails as to both David and Daniel Allen.

### Conflict of Interest (Count 9)

■ In Count 9, ATN asserts a similar claim against Daniel pursuant to Section 14A:6–8 of the New Jersey Statutes, titled "Director Conflicts of Interest." The statute provides that a contract between a corporation and one of its directors is not void or avoidable solely because of the relationship between the parties as long as: (1) the transaction is "fair ... and reasonable to the corporation at the time it is authorized, approved, or ratified;" or, (2) the director's interest is known to the board and the contract or transaction is authorized, approved, or ratified by affirmative vote of the majority of the disinterested directors. N.J. STAT. ANN. § 14A:6–8. Once the proposed transaction and any possible conflict of interest is fully disclosed and the necessary insiders have consented based upon competent information, no further action will lie under the statute. *Kim v. Flagship Condominium*

*Owners Association*, 327 N.J.Super. 544, 744 A.2d 227, 232 (2000).

■ In this case, the Agreement was fair and reasonable to the corporation at the time it was executed. Moreover, the transaction was not secret or concealed but fully disclosed and consented to by all relevant parties. Every shareholder, officer, and director not only participated in the negotiations of the Agreement but executed the final version, even Robert Carpenter. Having endured years of litigation regarding the respective rights of the various parties, none of these insiders can now claim that any of them were unaware of the Allens' individual interests or that they would benefit under the settlement.

In addition, this claim is encompassed in the release given by ATN to Daniel in the Agreement. Therefore, the claim is barred. Count 9 fails.

### Unjust Enrichment (Count 10)

■ Under New Jersey law, unjust enrichment is not an independent theory of liability, but is an alternative remedy that exists only if no other remedy at law, such as recovery under a contract, is available. The theory rests on the equitable principle that a person shall not be allowed to enrich himself at the expense of another. *National Amusements, Inc. v. New Jersey Turnpike Authority*, 261 N.J.Super. 468, 619 A.2d 262 (N.J.Super.Ct.Law Div.1992) (*citing Callano v. Oakwood Park Homes Corp.*, 219 A.2d 332, 91 N.J.Super. 105 (1966)). To recover on a theory of unjust enrichment, ATN must prove that: (1) ATN conferred a benefit upon the Allens; (2) the Allens did not provide any consideration in return for the benefit; (3) the Allens voluntarily accepted and retained the benefit; and, (4) the Allens have been unjustly enriched thereby. *Media Services Group v. Bay Cities Communications, Inc.*, 237 F.3d 1326, 1330 (11th Cir. 2001).

 ATN's argument as to unjust enrichment fails on several grounds. First, ATN obviously has alternative remedies at law, namely, all of the other counts raised in this adversary proceeding, but it failed to prove it is entitled to relief under any count. Second, as was the case with Counts 8 and 9, the unjust enrichment claim is likewise encompassed within the release granted by ATN to the Allens in the Agreement. Accordingly, ATN is precluded from asserting this cause of action. Third, even though ATN conferred a benefit on the Allens, which they voluntarily accepted and retained, no unjust enrichment occurred. The Allens provided consideration in return for the payments made by ATN; they forfeited their stock interests in ATN. ATN could have retained the stock, but instead Carpenter purchased it in exchange for executing promissory notes of $6,250,000 payable to ATN. ATN paid the Allens $6,250,000 and received promissory notes from Carpenter in the same amount. For all of these reasons, the court finds that ATN has failed to prove its claim for unjust enrichment. Count 10 fails.

### Accounting (Count 11)

 Similar to the unjust enrichment count, ATN's right to an accounting arises only if no other alternative remedy at law exists. *Dairy Queen, Inc., v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *First Commodity Traders, Inc., v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir.1985). Further, to obtain an accounting, ATN must prove that "the accounts between the parties are of such a complicated nature that only a court of equity can satisfactorily unravel them." *Dairy Queen,* 369 U.S. at 478, 82 S.Ct. 894 (citation and internal quotations omitted). ATN has failed to show that it lacks an adequate remedy at law or that the Allens use of the funds obtained pursuant to the Agreement were so complex that unraveling is needed.

 However, these points are largely irrelevant because recovery under this count is appropriate only if ATN succeeded on any of the prior counts. ATN has failed to establish any basis to obtain a judgment against the Allens. As such, the Allens simply have no reason to account to ATN how they spent the monies obtained under the Agreement. Count 11 fails.

### Turnover (Count 12)

 In Count 12, ATN has pled an action for turnover of property of the estate pursuant to Section 542(a) of the Bankruptcy Code and for a declaration that the assets are property of the bankruptcy estate pursuant to Section 541 of the Bankruptcy Code. Count 12 does not constitute an independent basis for recovery. Rather, Section 542 of the Bankruptcy Code allows a debtor or a trustee to regain possession of property that properly belongs in the estate, as defined by Section 541 of the Bankruptcy Code. However, any right to turnover only arises upon entry of a judgment creating a right of recovery. *Ohio v. Madeline Marie Nursing Homes,* 694 F.2d 449, 463 (6th Cir.1982); *In re Penco Corp.,* 465 F.2d 693, 697 (4th Cir.1972). Therefore, because ATN has failed to succeed on any of its other counts against the Allens, no turnover is justified. Count 12 fails.

### Equitable Subordination (Count 13)

Daniel Allen filed a proof of claim, Claim 7 in the amount of $135,000, in ATN's Chapter 11 case. In the claim, Daniel asserts he is entitled to indemnification by ATN for all of the legal fees and costs he has incurred, primarily in connection with defending this adversary proceeding. The claim initially sought $135,000 in attorney

fees, but it was filed some time ago, on February 3, 2003. Additional fees and costs have likely since been incurred by the Allens.[41]

■■■ In Count 13, ATN contends that Daniel's claim should be equitably subordinated pursuant to Sections 510 and 544 of the Bankruptcy Code and applicable state law. Equitable subordination of a claim is appropriate if: (1) the claimant had engaged in inequitable conduct; (2) the conduct injured creditors or gave unfair advantage to the claimant; and, (3) the subordination of the claim is not inconsistent with the provisions of the Bankruptcy Code. *Estes v. N & D Properties, Inc.*, 799 F.2d 726, 731 (11th Cir.1986); *Benjamin v. Diamond (In re Mobile Steel)*, 563 F.2d 692, 700 (5th Cir.1977). Typically, some showing of fraud, overreaching, inequitable conduct, or a violation of the rules of fair play and good conscience by the claimant is needed to warrant subordination. *In re Ludwig Honold Mfg. Co., Inc.*, 46 B.R. 125, 128 (Bankr.E.D.Pa.1985) (*citing Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939)).

■■■ ATN makes the same arguments to demonstrate inequitable conduct under this count that the court rejected in the numerous prior counts. Daniel is not guilty of any overreaching, inequitable conduct, or of violating the rules of fair play or good conscience. He settled a lawsuit. He was paid for his stock. Neither of the Allens acted inequitably. Any right they have to indemnification should not be subordinated to the claims of other unsecured creditors, particularly since neither of the Allens has been associated with ATN from the time of the settlement, January 12, 1999, through the date ATN filed this Chapter 11 case, January 10, 2003, four years later. Once again the court observes that ATN's problems were not caused by the Allens or the settlement of the shareholder litigation but by numerous other market factors. Equitable subordination of Daniel's claim is not merited. Count 13 fails.

### The Allens' Counterclaim

■■■ The Allens have filed a counterclaim seeking damages against ATN for breaching the releases they were granted under the Agreement. The releases, contained in paragraph 9.1 of the Agreement, provided that ATN released the Allens from "any claims, demands, debts, damages, liabilities, obligations, actions, or causes of action of any nature whatsoever, whether known or unknown, that now exist or may arise in the future arising from any act or omission occurring from the beginning of time through the date of this Agreement, other than for obligations arising pursuant to this Agreement." (Plaintiff's Exh. No. 6). Such a broad release arguably would encompass the claims asserted by ATN against the Allens in this adversary proceeding.

The Allens contend that they have incurred substantial attorney's fees and costs in defending ATN's claims against them in breach of the releases. The Allens allege these fees and costs exceed $700,000; however, no court has determined the reasonableness of these fees or concluded that all of the fees incurred were directly attributable to the claims asserted in this adversary proceeding as opposed to the Allens' participation in ATN's Chapter 11 case. (Defendants' Exh. No. 88). Without question, the fees are significant.

---

41. As of the trial date, the Allens had paid $358,669.86 in attorney fees and owed an additional $370,000. (Defendants' Exh. No.

88). The court assumes additional fees were incurred in connection with post-trial legal services.

Paragraph 13.5 of the Agreement further provides that "[i]f any party shall breach this Agreement, the non-breaching party shall be entitled to recover, in addition to other damages, reasonable attorney's fees and costs." (Plaintiff's Exh. No. 6). As such, it appears that ATN, having breached the Agreement by pursuing claims apparently barred by the applicable releases, is required to reimburse the Allens for their fees and costs.[42]

However, at this point, the Allens are not entitled to any affirmative recovery against ATN. Confirmation of ATN's plan and the resulting injunction imposed pursuant to Section 1141 of the Bankruptcy Code has terminated any affirmative recovery the Allens may request, other than any distributions due under the confirmed plan that Daniel may receive on Claim 7.

The Allens further argue that affirmative recovery is possible, but only if the order confirming ATN's plan of reorganization is overturned on appeal. At this point, the Allens, as appellants, have requested that the United States District Court for the Middle District of Florida, the court handling the appeal of ATN's confirmation order, abate any consideration of the appeal pending the final adjudication of the issues raised in this adversary proceeding. As such, the District Court is likely not actively considering the pending appellate issues. This court cannot predict the outcome of the appeal, but the District Court certainly could reverse the confirmation order. If so, it is possible that, sometime in the future, the Allens could be entitled to damages for ATN's breach of the Agreement.

However, consideration of any award of fees or costs, at this point, would be premature. The District Court has the appeal of ATN's confirmation order under advisement. If the order is affirmed (and not further appealed), the Allens are not entitled to any recovery. On the other hand, if the confirmation order is reversed, the case likely will be remanded to this court for further proceedings relating to confirmation. Until a final order is entered resolving all issues surrounding the confirmation of a plan by ATN, the court is unable to make any determination of whether the Allens are entitled to any affirmative relief in the form of reimbursement for attorney fees and costs incurred in this adversary proceeding. Therefore, the court reserves ruling on the Allens' counterclaim until either a final order is entered affirming the current confirmation order or, alternatively if the Allens' succeed in their appeal, the confirmation issues are finally resolved by further proceedings. In any event, a further evidentiary hearing would be necessary to determine the total amount of fees and costs incurred by the Allens. *See, e.g., Union Carbide Corp. v. Viskase Corp. (In re Envirodyne Indus., Inc.)*, 183 B.R. 812, 819 (Bankr.N.D.Ill.1995) (denying motion for payment of amount not yet due; right of setoff could not be known until completion of future proceedings); *In re Eldridge*, 210 B.R. 188, 191 (Bankr.N.D.Ala. 1997).

Because of the uncertainty as to whether the Allens may ever be entitled to any affirmative relief under their counterclaim, the court also will abate any further proceedings on the counterclaim, pending the request of any party in interest to request a hearing on the issue. Therefore, the clerk may close the adversary proceeding. If the issue raised by the counterclaim does become germane at some point in the

---

**42.** The Allens also argue that they are entitled to a set-off against any monies ATN recovers against the Allens. The court agrees a set off would be appropriate, but, because no judgment will be entered against the Allens, no set-off is merited.

future, any party in interest may request a hearing. Upon such a request, the clerk is directed to reopen the adversary proceeding, without fee, for the sole purpose of resolving the counterclaim.

### Conclusion

Nine years ago, Gary Carpenter forced Daniel Allen from ATN's premises. Two courts in five years of litigation have heard the disputes between Carpenter, the Allens, and ATN. In 1998, the parties reached a settlement. In 2003, ATN resurrected the dispute in this adversary proceeding, seeking to undo the settlement. This court can find no basis to avoid the Agreement. Accordingly, the court finds that ATN is not entitled to relief on any count. Judgment will be entered in favor of the Allens and against ATN on Counts 1 through 13. The court reserves ruling on the Allens' counterclaim, if it ever becomes germane. A separate order consistent with this opinion shall be entered.